UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
No.:  1:21-CV-00522

| | | |
|---|---|---|
| MOHAN N. HARWANI, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | (Jury Trial Demanded) |
| THE MOSES H. CONE MEMORIAL | ) | |
| HOSPITAL OPERATING CORPORATION, | ) | |
| d/b/a CONE HEALTH MOSES CONE | ) | |
| HOSPITAL or MOSES CONE HOSPITAL and | ) | |
| JONATHAN J. BERRY, M.D., | ) | |
| | ) | |
| Defendants. | | |

NOW COMES Plaintiff, Mohan Harwani, M.D., by and through counsel, and complaining of Defendants, alleges and says:

## PARTIES, JURISDICTION, AND VENUE

1.     Defendant The Moses H. Cone Memorial Hospital Operating Corporation, d/b/a Cone Health Moses Cone Hospital or Moses Cone Hospital ("Moses Cone") is a North Carolina corporation organized and existing under the laws of the State of North Carolina and operating inpatient hospital facilities with its principal place of business in Guilford County, North Carolina. At all times relevant to this action, Moses Cone was engaged in the business of managing and operating hospital facilities for the treatment of persons in need of medical care and attention.

2.     Defendant Dr. Jonathan Berry has practiced interventional cardiology and peripheral vascular medicine at Moses Cone for 25 years. For the past fifteen years or so,

he served as Chairman of the Moses Cone Peer Review Committee and Chief of the Cardiovascular Section at Moses Cone. In that role, he has directly impacted the way Moses Cone has interacted with interventional cardiologists who have privileges there.

3.      Moses Cone, by and through its Medical Director, Chief of Staff, and Medical Executive Committee ("MEC") of the Medical Staff, is charged with the duty of administering the rules, policies, and bylaws governing its medical staff, which is the organization of physicians who provide care and treatment to patients at Moses Cone, and that duty includes making recommendations to Moses Cone's Board of Trustees with respect to the appointment and removal of physicians from Moses Cone's Medical Staff and the granting or termination of clinical privileges to physicians at Moses Cone.

4.      Defendants have an obligation and duty to apply the rules and follow their policies in a fair, nondiscriminatory manner by law and in accordance with the applicable contracts, policies, bylaws, and guidelines. Any action taken by Defendants to strip privileges from a doctor who has been granted privileges to practice at Moses Cone must be fair, nondiscriminatory, and in accordance with applicable due process standards to show equal application to all doctors granted license and privileges to practice medicine at Moses Cone.

5.      Plaintiff Dr. Harwani, is a citizen and resident of Guilford County, North Carolina.

6.      At all times relevant to this action, Dr. Harwani has been a physician who is board certified in the medical field of cardiovascular disease and duly licensed to practice medicine in North Carolina.

7.      Dr. Harwani maintained privileges for admitting and to perform diagnostic and interventional cardiology procedures at Moses Cone since 1996, and has had medical staff membership and clinical privileges at all times since then until 13 July 2019.

8.      From 13 July 2019, to the present, Dr. Harwani has not had privileges to perform interventional cardiology procedures at Moses Cone as a result of the wrongful suspension and then termination of his privileges without due process and in a discriminatory manner as alleged below.

9.      This case presents an actual case and controversy arising under federal law, and Plaintiff asserts claims for relief under 42 U.S.C. § 1981, as well as claims for relief under North Carolina state law.

10.     Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331, 1443, and 1343.

11.     This Court has pendant or supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this, the Middle District of North Carolina, under 28 U.S.C. § 1391 because Plaintiff and Defendants reside in Guilford County, North Carolina, and a substantial part of the claims asserted arose in the Middle District.

## FACTS

13.     Since starting his practice in the Triad region in 1996, Dr. Harwani has performed over 2,000 interventional cardiology procedures and over 3,000 diagnostic cardiology procedures in the Greensboro area and maintained a low complication rate.

Case 1:21-cv-00522-UA-JEP   Document 1   Filed 06/24/21   Page 3 of 39

14.     Moses Cone granted Dr. Harwani clinical privileges after he applied for them and complied with its Medical Staff Bylaws, policies, and procedures.

15.     The terms of the Medical Staff Bylaws, policies, and procedures form a valid and enforceable contract between Dr. Harwani and Moses Cone Hospital.

16.     Moses Cone's actions alleged herein, including but not limited to its decision to deny Dr. Harwani clinical privileges, the process in which it engaged related to that decision, and its decision to deny Dr. Harwani's appeal, were unauthorized and violated its own Medical Staff Bylaws, policies, and procedures, and thus breached its contract with him.

### THE EARLIER HARASMENT AND DISCRIMINATION

17.     Over the course of the past 20 years or so, Defendants repeatedly singled out and harassed Dr. Harwani. They wrongly accused him at various times of exercising poor patient selection, expressing concerns allegedly relating to his patient management, and on a few occasions claiming he had poor communication with nurses and other staff. On most of these occasions, Defendants asked Dr. Harwani to provide a written explanation for his clinical decision making and actions after making these false accusations. On each such occasion, after investigating and incorporating Dr. Harwani's written explanations, Moses Cone determined that Dr. Harwani acted in an acceptable manner and did not violate the Bylaws or the applicable standard of care. On the rare occasion when Moses Cone responded to Dr. Harwani's written explanations, Moses Cone praised his commitment to providing excellent care to patients and abiding by its regulations.

4

18.     In 2017, Dr. Berry, as both Chair of the Moses Cone Medical Peer Review Committee and Chief of the Cardiovascular Section at Moses Cone, brought two of Dr. Harwani's patient cases to the attention of the MEC and the Peer Review Committee for review. He had taken it upon himself to investigate Dr. Harwani's patient cases going back a year in time, of his own volition and without direction from Moses Cone.

19.     In an 8 March 2017, letter Dr. Berry told Dr. Harwani that he had until 19 April 2017, to submit a written response to justify and explain his clinical decisions on the first of the two patient cases.

20.     In a 3 April 2017, letter Dr. Berry told Dr. Harwani that he had until 19 April 2017, to submit a written response to justify and explain his clinical decisions related to the second patient case that Dr. Berry later identified when he undertook his independent review of Dr. Harwani's patient cases.

21.     On 10 April 2017, Dr. Harwani met with Dr. Bruce Swords, who was the chief medical officer for Moses Cone, and Dr. Anand Hongalgi, who was a medical services chief at Moses Cone. Neither Dr. Swords nor Dr. Hongalgi are cardiologists or interventional cardiologists, so they did not have the expertise or experience to understand the claims Dr. Berry had leveled against Dr. Harwani. Dr. Berry was supposed to attend but avoided the meeting, so he did not hear Dr. Harwani explain why his actions met the standard of care.

22.     Nevertheless, despite the presence an actual interventional cardiologist who would understand what Dr. Harwani explained, Dr. Swords and Dr. Hongalgi suspended Dr. Harwani's interventional cardiology privileges starting on 15 April 2017. They told Dr.

5

Harwani that the reason for the delayed suspension was concern about patient safety. They suspended Dr. Harwani's privileges before he even had an opportunity to submit his written response to the false allegations. Also, they failed to explain why—if they were actually concerned about patient safety—Dr. Harwani could continue to treat patients for five days.

23.     On 17 April 2017, the MEC discussed Dr. Harwani's suspension. Dr. Berry presented information to the MEC about Dr. Harwani's management of each patient. In making those presentations to the MEC, Dr. Berry omitted pertinent clinical facts that showed why Dr. Harwani's clinical decision-making was appropriate. Dr. Berry misrepresented these facts in an effort to discriminate against Dr. Harwani. Based at least in part on Dr. Berry's inaccurate and incomplete presentation, the MEC voted to continue the suspension without considering any comment or written response from Dr. Harwani.

24.     Dr. Harwani provided a written response to the Moses Cone Peer Review Committee on 19 April 2017, as requested.

25.     Dr. Harwani met with Dr. Berry, Dr. Swords, and Dr. Hatcher, who was the CEO of Moses Cone, at some point before 15 May 2017, around 25 April. At this meeting, Dr. Berry told Dr. Swords and Dr. Hatcher that Moses Cone should have stripped Dr. Harwani's privileges to perform cardiology procedures five or six years earlier.

26.     By 2017, Dr. Berry had waged an unfounded, vindictive campaign against Dr. Harwani for over a decade. He had reviewed years of Dr. Harwani's procedures and placed Dr. Harwani on a focused review back in 2010. This earlier harassment had, to Dr. Berry's dismay, led to the conclusion that Dr. Harwani had done nothing wrong and provided safe patient care.

6

27.     A person attended this meeting and took notes for Moses Cone. Dr. Harwani has repeatedly made specific requests for those notes and that information, but Moses Cone has refused to produce any minutes or notes related to this meeting.

28.     During a meeting on 26 April 2017, the MEC again discussed Dr. Harwani's suspension and voted to continue it until an investigation was completed. The MEC still had not heard anything from Dr. Harwani by live testimony or written response when it voted to continue the suspension.

29.      On 26 April 2017, the Moses Cone Peer Review Committee discussed Dr. Harwani's suspension during a meeting and decided to continue the suspension of his privileges before any outside review had occurred.

30.     On 11 May 2017, the MEC Investigative Subcommittee announced during a meeting that it would submit the two of Dr. Harwani's patient cases in question to the Carolina Health System (now Atrium) in Charlotte for an outside review. The minutes reflect that there were no other alleged safety issues noted related to Dr. Harwani's practice at Moses Cone since the focused review back in 2010. That means that the MEC looked and confirmed that Dr. Harwani consistently met the standard of care and did a good job with his patients and clinical practice from at least 2010 to 2017.

31.     On 23 June 2017, Dr. Dan Hagler, Chairman of the Carolina Health System External Peer Review Committee, sent four letters that explained both outside reviewers found that Dr. Harwani acted appropriately in both cases that Dr. Berry had identified to accuse Dr. Harwani of unsafe patient care.

7

32.     Four months dragged between the time that Moses Cone preemptively suspended Dr. Harwani's privileges without giving him any due process or opportunity to defend himself and the favorable report from the unbiased, outside reviewers.

33.     Dr. Berry's internal Moses Cone review, that he solicited, led to a decision in direct conflict with the neutral, outside reviewers who had no stake in Moses Cone's internal politics.

34.     On 7 July 2017, the MEC Investigative Subcommittee met and decided that Moses Cone should immediately restore Dr. Harwani's privileges to perform interventional cardiology procedures.

35.     Over a month later, on 16 August 2017, Dr. Swords sent Dr. Harwani a letter finally reinstating his privileges to perform interventional cardiology procedures. Moses Cone provided no explanation for why it allowed an additional five weeks to elapse from the time it decided to reinstate Dr. Harwani's privileges until it finally bothered to let him know that fact.

36.     Dr. Berry and Moses Cone should have reinstated Dr. Harwani's full privileges as soon as the unbiased, outside reviewers confirmed that Dr. Harwani acted appropriately and within the standard of care. For reasons that can only be explained as unreasonable and discriminatory, Dr. Berry and Moses Cone waited and did not reinstate Dr. Harwani's privileges for over seven weeks after receiving the reports from the unbiased, outside reviewers.

37.     Dr. Harwani lost business and patients in the interim months between when Moses Cone stripped his interventional cardiology privileges without any due process and

8

when it finally restored them. This caused him financial and reputational damage, along with embarrassment and mental suffering and anguish.

38.     Despite the non-biased, outside reviewers' confirmation of Dr. Harwani's patient management and reinstatement of his interventional privileges, one month later, after receiving a non-biased confirmation of his professionalism, on 11 September 2017, Dr. Berry placed Dr. Harwani on a focused review for 24 months.

39.     Just a month after Dr. Berry's crusade against Dr. Harwani failed, instead leading to the official conclusion by the unbiased independent experts from outside Moses Cone's staff that Dr. Harwani was doing a good job and had been doing a good job since 2010, Dr. Berry unilaterally ramped up additional harassment and invasive techniques against Dr. Harwani.

40.     During this focused review, Dr. Berry and other interventional cardiologists at Moses Cone, assigned by their boss, Dr. Berry, reviewed every interventional case Dr. Harwani conducted with a focus on patient selection, care rendered, professional behaviors, and communication with nurses and staff.

41.     Upon information and belief, Dr. Berry and Moses Cone had never forced another interventional cardiologist to undergo a 24-month focused review like the one imposed upon Dr. Harwani. This was even more unusual given the fact that the Peer Review Committee had quite recently, if not belatedly, exonerated Dr. Harwani's treatment and care once it received the non-biased, outside reviews. Thus, after his first attempt backfired by essentially proving that Dr. Harwani was doing a good job providing his

9

patients with safe care and had been doing a good job since 2010, Dr. Berry chose a different weapon to attack Dr. Harwani.

42.     Upon information and belief, Dr. Berry and Moses Cone had never forced a white interventional cardiologist to undergo a focused review like the one they forced Dr. Harwani to endure.

43.     Over the next 14 months, Dr. Berry and Dr. Michael Cooper conducted this focused review of 45 of Dr. Harwani's interventional cardiology patient cases.

44.     On 25 October 2018, Dr. Berry sent Dr. Harwani a letter stating that he discontinued the focused review process ten months early, because: "The 45 cases reviewed were found to be within accepted standard practice guidelines as provided by the American College of Cardiology – Interventional Section and as per Cone Health Medical and Dental ByLaws, Rules and Regulations…As a result of the positive patient outcomes and the respectful collegial communication and interactions, it is the consensus of the Moses Cone Medical Peer Review Committee, and Dr. Anand Hongalgi, Chief, Medicine Section, to discontinue the focused review of every interventional case."

45.     Moses Cone, specifically at the behest of Dr. Berry, has imposed excessive scrutiny on Dr. Harwani beginning in 2001. Moses Cone subjected Dr. Harwani to retrospective case review of over 350 cases by the Peer Review Committee in 2001 and again in 2006-2009. Despite repeated excessive scrutiny of Dr. Harwani, primarily at Dr. Berry's command, they have produced no significant findings or any medical treatment that deviated from the standard of care.

46.     Defendants also engaged in a focused review of Dr. Harwani's patient cases in 2001-2002, 2009-2010, and 2017-2018. They prospectively reviewed over 150 of Dr. Harwani's patient cases during these periods. Each time, these reviews led to the conclusion that Dr. Harwani met the acceptable standard of care and provided good and acceptable care in all instances.

47.     Dr. Harwani has met all requirements to practice interventional cardiology at Moses Cone. Indeed, in spite of Defendants' efforts to unjustly and unceremoniously discard Dr. Harwani, they succeeded in proving the opposite time after time. This has confirmed that he did a good job and provides good and acceptable patient care.

48.     Upon information and belief, Moses Cone and Dr. Berry never subjected any white doctor in Dr. Harwani's specialty to any similar instances of repeated, harassing, invasive accusations and investigations.

49.     Upon information and belief, Moses Cone and Dr. Berry have subjected other non-white doctors of Indian nationality and ethnicity in Dr. Harwani's specialty to similar instances of repeated, harassing, invasive accusations and investigations and have improperly stripped one or more of them of privileges in an unfair, discriminatory fashion.

**THE 2019 IMPROPER TERMINATION AND DISCRIMINATION**

50.     On 27 June 2019, Dr. Harwani was performing an interventional cardiology procedure at Moses Cone. During the procedure, he asked a nurse who was assisting him to administer a particular medication. The nurse refused, claiming that Dr. Harwani's clinical decision-making and request for administration of that drug was inappropriate.

This refusal put the patient in danger. Another staff member provided the medication as Dr. Harwani ordered.

51.     In Dr. Harwani's 24 years of working at Moses Cone, he had never filed any formal complaints against another physician or staff. However, the nurse's refusal to follow his order violated the standard of care and medical ethics exposing the patient to unnecessary danger. After the procedure finished, Dr. Harwani reported the violation to the Director of Invasive Cardiovascular Services.

52.     The Director held a brief meeting with the catheterization lab staff and discussed Dr. Harwani's report about the violation. The Director took no action against the nurse who refused Dr. Harwani's order.

53.     On 13 July 2019, within minutes after completing a more than five-hours-long, complex interventional procedure, complicated by Spontaneous Coronary Artery Dissection (SCAD) in the setting of ST-segment elevation myocardial infarction (STEMI), requiring the placement of five stents, the President of the Medical and Dental Staff of Moses Cone spoke to Dr. Harwani by phone and told him that Moses Cone was suspending his diagnostic and interventional cardiology privileges effective immediately.

54.     Moses Cone did not convene, much less conduct, any peer review of the patient case in question prior to summarily suspending Dr. Harwani's clinical privileges that day.

55.     The patient not only survived the procedure, but was discharged to home a few days later and, upon information and belief, maintains an active lifestyle to this day.

56.     As before, Dr. Berry orchestrated this latest assault on Dr. Harwani's privileges.

57.     Dr. Berry actually entered the catheterization lab and interacted with Dr. Harwani on two separate occasions during this 13 July patient case. Dr. Berry was a direct witness of what occurred. Dr. Berry first encountered Dr. Harwani during this procedure near the beginning shortly after the intervention was undertaken. Dr. Berry did not say anything to Dr. Harwani at that time to suggest that Dr. Berry thought Dr. Harwani took some improper action that somehow put the patient in danger. Dr. Berry did not intervene, take over, or tell Dr. Harwani to stop.

58.     Later near the end of the procedure, Dr. Berry came back into the lab and discussed certain aspects of the procedure with Dr. Harwani. Again, Dr. Berry never said anything to Dr. Harwani on that second occasion to suggest that Dr. Berry thought Dr. Harwani took some improper action that somehow put the patient in danger. Dr. Berry did not intervene, take over, or tell Dr. Harwani to stop when he came into the lab that second time.

59.     What Dr. Harwani did not know at the time, the reason Dr. Berry apparently came to the lab that day during the procedure was because he engaged in inappropriate correspondence with a staff member who was supposed to be assisting Dr. Harwani with the procedure.

60.     Defendants produced a limited subset of text message screenshots during the Fair Hearing that showed how Dr. Berry and this staff member engaged in inappropriate, intimate conversations by text. Upon information and belief, many more inappropriate text

13

messages exist showing the nature and extent of Dr. Berry's relationship with this staff member, but Defendants only produced a few cherry-picked messages that they thought supported Dr. Berry's claims against Dr. Harwani.

61.     According to the few text messages from the limited set of screen shots provided, the lab technician working with Dr. Harwani on this patient case on July 13 sent Dr. Berry some informal text messages from inside the lab during the actual procedure that included an emoji to express her disapproval of how Dr. Harwani, who was the doctor in charge, performed the procedure. Upon information and belief, the lab technician felt comfortable texting an emoji to Dr. Berry from inside the lab during an active interventional cardiology procedure which led to Dr. Berry entering the lab and discussing the patient's case, without any criticism or suggestion of any problem, with Dr. Harwani in the middle of the procedure.

62.     Dr. Harwani has never had the ability to explore the full contents and context of the relationship between Dr. Berry and this staff member, or the other staff members at the lab, which led to inappropriate, informal text messages using an emoji to criticize how a physician provided medical care to a patient in the middle of an ongoing interventional cardiology procedure.

63.     Upon information and belief, Dr. Berry spoke with the President of the Medical and Dental Staff of Moses Cone while Dr. Harwani was performing that procedure on 13 July and convinced the President to suspend Dr. Harwani's privileges without any due process. This conversation apparently occurred in between the two times Dr. Berry entered the lab and discussed certain aspects of the procedure with Dr. Harwani. Dr. Berry

14

called the President to complain about what Dr. Harwani did during the procedure, but he never said anything to Dr. Harwani either time he was physically present with Dr. Harwani during the procedure to suggest that he thought Dr. Harwani took some improper action that somehow put the patient in danger. Dr. Berry did not intervene, take over, or tell Dr. Harwani to stop when he came into the lab either time, but he did call the President and had Dr. Harwani's privileges suspended.

64. Upon information and belief, Dr. Berry never treated any white or Caucasian physicians in this manner, colluding with staff to undermine a fully-credentialed interventional cardiologist while he was actively performing a procedure on a patient. Dr. Berry only treated Dr. Harwani with this level of disrespect based on the fact that he was born in India and of different non-white ethnicity.

65. On 15 July 2019, the MEC decided to yet again suspend Dr. Harwani's privileges to perform interventional and diagnostic cardiology procedures and decided without any comment or explanation from Dr. Harwani or any other due process or a hearing, The MEC appointed a special investigation team that included four doctors, only one of whom was a cardiologist. The other three were a family medicine doctor, a pathologist, and an emergency medicine doctor. Those three had no particular knowledge or understanding of how and why an interventional cardiologist would take certain actions during an interventional cardiology procedure. Defendants notified Dr. Harwani that they suspended his privileges in a letter.

66. Over the next week or so, the special investigation team interviewed eight people.

15

Case 1:21-cv-00522-UA-JEP   Document 1   Filed 06/24/21   Page 15 of 39

67.     On 23 July 2019, two of the four members of the special investigation team interviewed Dr. Harwani. The lone cardiologist on that team did not attend or participate in that interview, so there was no physician with expertise or experience to understand what Dr. Harwani explained about why he took certain actions during that 13 July procedure for this patient case.

68.     Because of the complexity and rarity of the patient presentation in that case in question, it was crucial for Dr. Harwani to have an opportunity to explain his clinical decision-making and management to an interventional cardiologist who would have the experience and training to understand the explanation. The fairest method would have been to convene a hearing panel comprised exclusively of non-biased interventional cardiologists who had no fear of retribution from Moses Cone or Dr. Berry. Dr. Harwani did not even have a chance to speak with the one cardiologist on the team.

69.     Upon information and belief, Moses Cone and Dr. Berry coordinated a sham hearing process and meetings to give the pretextual appearance of due process while actually violating Dr. Harwani's rights for improper, discriminatory reasons.

70.     During that same week time frame, upon information and belief, Dr. Berry communicated directly with and solicited reviews of Dr. Harwani's actions during that 13 July patient case from 7 interventional cardiologists who worked for Moses Cone under Dr. Berry's supervision and management or maintain privileges there.

71.     Upon information and belief, Dr. Berry did not provide these 7 internal reviewers a complete record of all pertinent information and the full clinical presentation of the patient that Dr. Harwani had available to him when he treated that patient on 13 July.

16

72.     Upon information and belief, Dr. Berry did not provide these 7 internal reviewers Dr. Harwani's explanation of why he did what he did when treating this patient on 13 July.

73.     Upon information and belief, Dr. Berry presented the information to and requested review from the 7 physicians in a skewed fashion that essentially predetermined a negative result for Dr. Harwani.

74.     Even under those adverse and unfair circumstances, those 7 internal reviews came to varied interpretations of Dr. Harwani's actions. In any event, none of these 7 internal reviews gave these short interpretations under oath or presented affidavits to suggest that they considered their commentary to be truthful under penalty of perjury.

75.     One of the reviews stated that "the patient's clinical condition could significantly influence management decisions in real-time." which meant he thought that Dr. Harwani could have acted appropriately and within the applicable standard of care, but that reviewer did not think he had enough information to say one way or the other.

76.     Indeed, another reviewing physician noted that if a patient has SCAD in the presence of STEMI and an almost totally or totally occluded blood vessel on her heart, it would be appropriate to perform an interventional cardiology procedure to attempt to fix the blockage and save heart tissue from unnecessarily dying. That is exactly what happened during Dr. Harwani's 13 July patient case. That same reviewer then claimed, incorrectly, that these circumstances were not presented during Dr. Harwani's 13 July patient case. This reviewer received an incorrect version of the facts. Upon information and belief, Dr. Berry gave that reviewer these inaccurate facts. That proves that Dr. Berry gave this

17

reviewer skewed and incomplete information because he sought a particular outcome with these internal reviews from doctors under his control or influence.

77.     One of the 7 reviewing doctors had presented a patient case he had performed a few years earlier during a continuing medical education session offered at and by Moses Cone. That white doctor described the patient as having SCAD and STEMI with a fully blocked blood vessel on her heart. That doctor taught the other interventional cardiologists in attendance that day that he made a clinical decision to perform an interventional cardiology procedure on that patient to attempt to fix the blockage and save heart tissue from unnecessarily dying. Moses Cone and Dr. Berry did not investigate, punish, terminate, or focus review this white doctor's actions from that earlier patient case. Instead, they asked him to teach the other interventional cardiologists that this was the standard of care at Moses Cone for that type of patient presentation.

78.     Dr. Harwani attended this reviewing doctor's presentation at Moses Cone about how to treat a patient who has SCAD and STEMI with a fully blocked blood vessel on her heart. That is exactly what Dr. Harwani did with his patient who had SCAD and STEMI with a fully blocked blood vessel on her heart on 13 July.

79.     On 24 July 2017, the special investigative subcommittee met to discuss Dr. Harwani's 13 July patient case.

80.     On 25 July 2017, the MEC met to discuss Dr. Harwani's 13 July patient case. During that meeting, the MEC admitted and discussed that Dr. Harwani was not the only interventional cardiologist at Moses Cone to have missed a diagnosis of SCAD. However, upon information and belief, neither Moses Cone nor Dr. Berry had ever pursued this type

18

of scorched earth campaign to suspend and terminate any of those other physicians' privileges in the same manner as they attacked Dr. Harwani.

81.    Upon information and belief, those other physicians who had missed a diagnosis of SCAD at Moses Cone were white or Caucasian and received different, much more lenient and preferential treatment.

82.    Indeed, Dr. Berry has missed a diagnosis of SCAD and, upon information and belief, suffered no adverse consequences or even had to bother with any discussion about this missed diagnosis. Dr. Berry is white or Caucasian.

83.    As a result of the discussions at the MEC meeting on 25 July 2019, Moses Cone and Dr. Berry suspended Dr. Harwani's privileges to perform interventional cardiology procedures, but restored his privileges to perform diagnostic cardiology procedures.

84.    In a letter dated 26 July 2019, Defendants notified Dr. Harwani that the suspension of his privileges to perform interventional cardiology procedures would continue without due process or hearing, based on vague and conclusory allegations of "concerns relative to clinical judgment, medical management, and communications with the Cardiovascular Laboratory staff that could place patients in imminent danger."

85.    Incongruously, Defendants immediately restored Dr. Harwani's privileges to perform diagnostic cardiology procedures in the same letter. Despite the stated concern for patient safety and Dr. Harwani's medical judgment, Defendants allowed him to perform these invasive procedures to examine his patients' coronary arteries and diagnose their heart disease using the same type of wires and equipment that are placed inside the patient's

19

blood vessels subjecting the patient to many of the same risks associated with an intervention. Dr. Harwani must exercise sound clinical judgment and communicate with the same staff when he performs these diagnostic cardiology procedures as when he performs an interventional cardiology procedure.

86.     Since losing his privileges to perform interventional cardiology procedures, Dr. Harwani must refer his patients to another doctor whenever his patient has a need for intervention. Dr. Harwani provides a recommendation of what these patients need when he makes those referrals. No cardiologist to whom Dr. Harwani has referred a patient for a particular procedure has refused to perform the procedure recommended by Dr. Harwani under these circumstances. This confirms that Dr. Harwani's clinical judgment, medical management, and communication with staff are appropriate and acceptable.

87.     Dr. Harwani timely requested a hearing to contest Defendants' decision to strip his privileges to perform interventional cardiology procedures and followed all requisite Medical Staff Bylaws related to applications for hospital privileges and appeals for suspension of privileges.

88.     Moses Cone purportedly sent the 13 July patient case out for an external review conducted by un-named physicians at Atrium Health in the Charlotte area. Moses Cone never even provided the names of these purported outside reviewers to Dr. Harwani, so there is no possible way for Dr. Harwani to determine if these reviews were actually conducted, and if so, by whom or how. Was it done in a fair manner? Dr. Harwani has no clue.

89.     Needless to say, Dr. Harwani never had any opportunity to speak with or even know the identity of any purported external reviewer by any un-named alleged physician at Atrium, so he was not allowed to confront these potential accusers.

90.     The American Heart Association recently released a Scientific Statement on SCAD, stating: "Conservative therapy may not be appropriate in high-risk patients with ongoing ischemia, left main artery dissection, or hemodynamic instability. In such cases, it is the consensus of the working group that urgent intervention with percutaneous coronary intervention (PCI) or coronary artery bypass grafting (CABG) should be considered, but such decisions should be individualized and contemplated in the context of the coronary anatomy and the expertise of the operators or centers."

91.     The patient for whom Dr. Harwani performed PCI on 13 July that led to Defendants terminating his privileges was a high-risk patient who presented with SCAD-STEMI in the presence of ongoing ischemia. The patient had Dr. Harwani observed a blood vessel on the patient's heart close while he was conducting the diagnostic imaging of the patient's blood vessels around the heart. According to the guidance from the American Heart Association, Dr. Harwani had the ability to exercise his professional medical judgment and made an appropriate clinical decision to treat that patient.

92.     In response to Dr. Harwani's invocation of his right to a hearing, Defendants conducting a hearing procedure that exhibited an abject lack of fairness and deprived Dr. Harwani of his due process rights guaranteed by the Moses Cone Bylaws.

93.     The Hearing Panel was comprised of 5 physicians, none of whom were interventional cardiologists or had any experience in that field of medicine.

21

94.     Dr. Harwani called Dr. Samin Sharma as an expert witness. Dr. Sharma is the director of interventional cardiology at Mount Sinai Hospital in New York, and Senior Vice President of Operations & Quality at Mount Sinai Heart, which is one of the most prestigious such facilities in the world. Dr. Sharma traveled to and testified in-person at the hearing in support of Dr. Harwani's care of the patient on 13 July. In his letter, consistent with his live testimony, Dr. Sharma said "intervention on [the patient] was a complex PCI of STEMI case and was performed within the standard of care. There were no technical faults or any deviation from the accepted standard of care."

95.     Dr. Sanjay Gandhi, an interventional cardiologist at Wake Forest Baptist Medical Center in Winston-Salem, NC, also provided an expert opinion in a letter in support of Dr. Harwani's care of the patient on 13 July. In his letter, he wrote: "Given the patient's acute presentation and ongoing symptoms, the care provided was within accepted standard of care… The clinical decision-making and procedural care provided was consistent with standard medical care."

96.     In spite of the unfair procedure to which Defendants subjected Dr. Harwani, in violation of Moses Cone's Bylaws, Dr. Harwani presented clear evidence contradicting each of the allegations of "clinical concerns" raised by Defendants and demonstrated conclusively that he provided appropriate care consistent with the expectations and requirements of physicians on the medical staff of Moses Cone.

97.     Defendants did not provide Plaintiff with a fair or reasonable opportunity to confront and respond to the allegations against him made by Moses Cone, Dr. Berry, and the MEC. The allegations Moses Cone discussed and argued about at the hearing went far

22

beyond what the only actual issue, which was the 13 July patient case. This deviation from the stated topic of the hearing forced Dr. Harwani to discuss issues that he had not had a chance to prepare for adequately and were based on entirely inadmissible evidence and unsupported hearsay that lacked any indicia of reliability.

98.     The decision to deny the reinstatement of Dr. Harwani's privileges for interventional cardiology procedures was not based on any credible or reliable evidence. The decision failed to include any admissible evidence from providers or patients actually involved in any of the extraneous patient events that Moses Cone ambushed Dr. Harwani with at the last second during the hearing.

99.     Dr. Berry, the primary architect of the attacks on Dr. Harwani for the 13 July patient case and all of these years of harassment and abuse, who was literally physically present in the lab on 13 July when Dr. Harwani was performing the procedure but chose to allow Dr. Harwani to continue without comment or any indication of any concern while sneaking off to call the President of Moses Cone to orchestrate the suspension of privileges before the procedure even concluded, did not even testify at the hearing. Presumably that would have been awkward for Dr. Berry to show his obviously integral role as a fact witness because he sat in judgment and pulled the prosecutorial strings to deny Dr. Harwani's rights. This fact alone undermines any semblance or pretense of fairness in the hearing process foisted upon Dr. Harwani by Defendants.

100.     Inexplicably, the report from the Hearing Panel did not even mention Dr. Sharma's in person expert testimony relating to the issue of standard of care. No mention at all.

23

101.   Even under these patently unfair and unconstitutional circumstances, the Hearing Panel concluded that the MEC should offer Dr. Harwani a path to reinstatement of his full privileges to perform interventional cardiology procedures.

102.   Despite this recommendation, and without any explanation or comment, the MEC rejected the Hearing Panel's suggestion to offer Dr. Harwani a path to full reinstatement and completely terminated his already suspended privileges to perform interventional cardiology procedures.

103.   The Moses Cone Board of Trustees adopted the MEC's unexplained decision without comment or further explanation.

104.   Dr. Harwani timely filed an appeal and followed all of the Medical Staff Bylaws requirements related to appealing the termination of privileges.

105.   The Appellate Review Committee affirmed the Board of Trustees' decision to terminate privileges on the basis that Plaintiff "continues to demonstrate a lack of self-awareness of his communication issues, poor patient selection for interventional cases and poor management of interventional case, which has resulted in patient harm." None of these claims mentioned by this committee were actually at issue, and even if they had been, were not the subject of the hearing or MEC decisions. Even if they had been, the clear evidence showed that this was not supported by credible evidence, and conversely expert testimony of well-regarded interventional cardiologists working outside of and independent of Moses Cone supported the fact that Dr. Harwani acted within the standard of care in his treatment of the patient on 13 July.

24

106.    On 26 June 2020, the Board of Trustees voted to uphold the complete termination of Dr. Harwani's privileges to perform interventional cardiology procedures but noted that he may continue to exercise admitting and diagnostic cardiology privileges.

107.    Upon receiving this letter, Dr. Harwani exhausted all administrative remedies, rights to appeal, and reconsideration within the bounds of Moses Cone's by-laws.

## THE NORTHWOOD PROPERTY

108.    On 1 June 2011, Dr. Harwani purchased a piece of property at 104 W Northwood Street, Greensboro, NC 27401. This property is located across the street from Moses Cone's main hospital and campus in Greensboro.

109.    On 5 March 2015, a real estate brokerage firm working directly for Moses Cone sent an unsolicited letter to Dr. Harwani asking if he would be willing to sell his property to Moses Cone. Plaintiff told Moses Cone's brokers that he was not interested in selling.

110.    After Moses Cone's initial attempt to buy Dr. Harwani's property failed, over 3 years later on 29 August 2018, again without invitation, the same real estate firm that worked for Moses Cone sent another unsolicited letter to Dr. Harwani seeking to purchase his property. Plaintiff did not respond to Moses Cones' real estate firm's solicitation in 2018.

111.    In the summer of 2019, the owner of the office building adjacent to Plaintiff's property, received a call from realtors representing Moses Cone asking to purchase his office building. Dr. Harwani's property shares a parking lot with that building.

Case 1:21-cv-00522-UA-JEP   Document 1   Filed 06/24/21   Page 25 of 39

112.    Upon information and belief, Moses Cone owns all of the property on the city block surrounding Dr. Harwani's building and the adjacent building.

113.    Upon information and belief, Moses Cone has a plan to redevelop an entire corridor of property in the Northwood/Elm St./Carolina St. area of Greensboro which includes Dr. Harwani's property and all of the other property on that city block.

## FIRST CLAIM: AGAINST ALL DEFENDANTS
### (Civil Rights Violation Under 42 U.S.C. § 1981)

114.    Plaintiff fully incorporates all preceding paragraphs by reference.

115.    Plaintiff is a citizen of the United States who is of Indian origin and is a member of a racial minority group that is commonly perceived as both ethnically and racially distinct from a white person.

116.    As alleged herein, Plaintiff and Moses Cone had entered into a contractual relationship, via the terms of the Medical Staff Bylaws, policies, and procedures.

117.    From on or about 13 July 2019, and continuing to the present date, Defendants, by non-governmental discrimination based on race and non-white ethnicity, have deprived and impaired, and continues to deprive and impair Plaintiff of his right to make, perform, and enforce contracts, and his enjoyment of rights, benefits, privileges, terms, and conditions of their contractual relationship by its conduct described above.

118.    Defendants acted in a discriminatory manner against Plaintiff, on the basis of his race and non-white ethnicity, in purportedly performing its medical peer review functions and provision of privileges to practice, thereby violating Plaintiff's civil rights under 42 U.S.C. § 1981 as described above.

119. Plaintiff's race and ethnicity was the but-for motivating factor in Defendants' conduct alleged herein, including, but not limited to, Defendants' decision to suspend, terminate, and deny Plaintiff clinical privileges to practice interventional cardiology at Moses Cone.

120. Defendants acted with intent to discriminate against Plaintiff in their conduct alleged herein, including, but not limited to, Defendants' decision to suspend, terminate, and deny Plaintiff clinical privileges to practice interventional cardiology at Moses Cone.

121. Any nondiscriminatory reason(s) that Defendants may give for their conduct alleged herein were a pretext or excuse for Defendants' discrimination.

122. Plaintiff's race and non-white ethnicity was a determinative factor in Defendants' conduct alleged herein. But for Plaintiff's race and non-white ethnicity, Defendants' wrongful conduct against Plaintiff would not have occurred.

123. From on or about 13 July 2019, and continuing to the present date, Defendants treated Plaintiff differently than similarly situated Caucasian or white physicians.

124. It is Plaintiff's belief and understanding that Defendants have treated white physicians who made similar diagnoses related to SCAD STEMI versus atherosclerotic STEMI in other Moses Cone patients in a different manner and did not suspend or terminate those white physicians' privileges to perform interventional cardiology procedures such that Defendants' actions against Dr. Harwani was a pretext for discrimination.

125. Defendants responded to Plaintiff different than they had responded in the past to similarly situated white doctors who had alleged patient care issues. Thus, Plaintiff

27

did not receive the same legally protected right as a white person from Defendants on account of or by reason of Plaintiff's race and non-white ethnicity.

126.    It is Plaintiff's belief and understanding that Defendants discriminated against Plaintiff on the basis of race and non-white ethnicity, contrary to their Medical Staff Bylaws, policies, and procedures, and with gross disregard to Plaintiff's rights.

127.    It is Plaintiff's belief and understanding that Defendants acted in bad faith and with malice in suspending and terminating his privileges to perform interventional cardiology procedures.

128.    It is Plaintiff's belief and understanding that Defendants violation of their Medical Staff Bylaws, policies, and procedures and contractual obligations in suspending and terminating his privileges to perform interventional cardiology procedures was a pretext for discrimination.

129.    It is Plaintiff's belief and understanding that Defendants' refusal to consider direct, reliable evidence in suspending and terminating his privileges to perform interventional cardiology procedures was a pretext for their discrimination.

130.    It is Plaintiff's belief and understanding that Defendants' refusal to consider the opinions of objective expert witnesses in the field of interventional cardiology offered by Plaintiff, as their Medical Staff Bylaws, policies, and procedures require, in suspending and terminating his privileges to perform interventional cardiology procedures was a pretext for discrimination.

131.    Defendants' refusal to identify the names of the secret reviewers from the Atrium system, if they actually exist at all, and to consider the opinions of secret witnesses

28

who never confronted Dr. Harwani or gave him any opportunity to cross examine them in suspending and terminating his privileges to perform interventional cardiology procedures was a pretext for discrimination.

132.   Defendants improperly considered unqualified testimony from non-physician staff as if it was expert opinion in suspending and terminating his privileges to perform interventional cardiology procedures which was a pretext for discrimination.

133.   Defendants improperly considered inadmissible hearsay testimony in suspending and terminating his privileges to perform interventional cardiology procedures which was a pretext for discrimination.

134.   Defendants improperly considered evidence about what Dr. Berry did or thought in relation to the specific 13 July 2019 case without having him appear and subject himself to confrontation and cross examination in suspending and terminating his privileges to perform interventional cardiology procedures which was a pretext for discrimination.

135.   Defendants never even attempted to present any evidence about what any of Dr. Harwani's patients did or thought in relation to the specific 13 July 2019 case or any other patient case in suspending and terminating his privileges to perform interventional cardiology procedures which was a pretext for discrimination.

136.   Defendants relied upon witnesses who had obvious bias and motivation to say negative things about Dr. Harwani, regardless of the veracity of such testimony, without giving Dr. Harwani the opportunity to pursue proper impeachment of those witnesses motivations and biases either because the Hospital-selected "neutral" hearing

officer improperly precluded such lines of questioning or the witnesses were not physically present and the information was improperly provided as inadmissible hearsay without a fair opportunity for cross examination in suspending and terminating his privileges to perform interventional cardiology procedures which was a pretext for discrimination.

137.   Defendants improperly relied upon misleading evidence and discussed inadmissible hearsay versions of information without presenting actual evidence about the specific 13 July 2019 case and failed to timely produce a complete record of all relevant information, including specifically exculpatory evidence that would have directly or indirectly supported Dr. Harwani's positions, in suspending and terminating his privileges to perform interventional cardiology procedures which was a pretext for discrimination.

138.   Upon information and belief, Defendants improperly created or encouraged the creation of misleading evidence or heavily influenced evidence based on skewed or incomplete versions of the facts surrounding Dr. Harwani's actions during the specific 13 July 2019 case in suspending and terminating his privileges to perform interventional cardiology procedures which was a pretext for discrimination.

139.   Defendants improperly considered evidence about Dr. Harwani's alleged past actions that were completely unrelated to the specific 13 July 2019 case when that was the only issue that should have been considered in suspending and terminating his privileges to perform interventional cardiology procedures which was a pretext for discrimination.

140.   Defendants improperly withheld evidence about Dr. Harwani's past actions and cherry picked unreliable and misleading bits and pieces to present that were completely

unrelated to the specific 13 July 2019 case when that was the only issue that should have been considered in suspending and terminating his privileges to perform interventional cardiology procedures which was a pretext for discrimination.

141.    Defendants improperly relied upon misleading evidence and discussed hearsay information without presenting actual evidence about Dr. Harwani's past actions and cherry picked unreliable and misleading bits and pieces to present that were completely unrelated to the specific 13 July 2019 case when that was the only issue that should have been considered in suspending and terminating his privileges to perform interventional cardiology procedures which was a pretext for discrimination

142.    Upon information and belief, Defendants' exertion of undue and improper involvement and influence over the purportedly "neutral" decision-making process at each stage of the process from peer review committee, to MEC, to the Fair Hearing, to the Hospital-selected hearing officer, to the Board of Trustees decision in suspending and terminating his privileges to perform interventional cardiology procedures was a pretext for discrimination.

143.    Upon information and belief, the actual recommendation made after the Fair Hearing by those panel members was for Dr. Harwani to have his privileges to perform interventional cardiology procedures at Moses Cone restored after demonstrating he modified his clinical behavior and resolved any communication issues and had a focused review. For discriminatory reasons, Defendants subverted this outcome and instead permanently terminated his privileges to perform interventional cardiology procedures at Moses Cone with no hope of ever practicing there again.

144.    It is Plaintiff's belief and understanding that Defendants have treated him in a different, worse manner than they treat Caucasian or white physicians, and that Defendants refuse to recognize their responsibility for destroying Plaintiff's career and livelihood.

145.    Defendants have suspended and terminated Plaintiff's privileges in contravention of their Medical Staff Bylaws, policies, and procedures and contractual obligations.

146.    Defendants have purposely and maliciously misused the peer review process to the detriment of Plaintiff.

147.    Upon information and belief, a double standard of medical peer review exists at Moses Cone where Defendants scrutinize minority physicians more harshly than Caucasian or white physicians.

148.    Prior to engaging in the discrimination and wrongful conduct alleged here against Dr. Harwani, upon information and belief, Defendants had previously discriminated against minority, non-white physicians including, but not limited to, prior discrimination against at least one physician who was born in India and is of the same ethnicity as Dr. Harwani.

149.    As a direct and proximate result of the conduct of Defendants alleged here, Defendants have deprived and continue to deprive Plaintiff of the benefits of their contractual relationship and of achieving a livelihood as an interventional cardiologist doctor in the community and elsewhere.

32

150.     As a direct and proximate result of the conduct of Defendants alleged here, Plaintiff has suffered and continues to suffer actual and irreparable damage because he cannot practice interventional cardiology in Moses Cone, which is the only hospital where he had privileges, and Defendants have reported their adverse actions regarding Dr. Harwani's privileges to the National Practitioner Data Bank, which has the effect of causing other hospitals to deny him clinical privileges, and Defendants have caused irreparable harm to Dr. Harwani's professional stature and reputation through their discriminatory, improper conduct alleged above.

151.     Defendants' refusal to perform the contract with Dr. Harwani in a fair manner and in good faith was motivated by race, and but for this racial animus and Dr. Harwani's non-white ethnicity, Defendants would have fairly and properly applied their contractual obligations. That makes Defendants' racial discrimination the but for cause of the violations and breaches of the contract between them and Dr. Harwani. But for Dr. Harwani's race, Defendants' wrongful conduct and breaches would not have occurred. Defendants do not treat white or Caucasian physicians the same way or engage in improper conduct and violate and breach their contracts with white or Caucasian physicians that they did to Dr. Harwani, who is of Indian, non-white decent and ethnicity.

152.     As a direct and proximate result of Defendants' discriminatory, improper, Dr. Harwani has suffered other damages, including mental suffering and anguish, as may be proven at trial.

## SECOND CLAIM: AGAINST ALL DEFENDANTS
### (Breach of Contract and Violation of N.C. Gen. Stat. § 131E-85)

153.    Plaintiff fully incorporates all preceding paragraphs by reference.

154.    Defendants' actions set forth above regarding the suspension and termination of Dr. Harwani's clinical privileges at Moses Cone constitute breaches of the contract between Dr. Harwani and Defendants.

155.    Defendants' suspension and termination of Dr. Harwani's clinical privileges as alleged here, is arbitrary and capricious, not based on reason, and accordingly, unlawful.

156.    Defendants' suspension and termination of Dr. Harwani's clinical privileges was not reasonably related to the Hospital's operation.

157.    Defendants' suspension and termination of Dr. Harwani's clinical privileges was not reasonably compatible with the Hospital's responsibility.

158.    Defendants' suspension and termination of Dr. Harwani's clinical privileges was based on irrelevant considerations.

159.    As a direct and proximate result of Defendants' arbitrary and capricious conduct, Dr. Harwani has suffered damages as may be proven at trial in an amount in excess of twenty-five thousand dollars ($25,000.00).

160.    As a direct and proximate result of Defendants' arbitrary, capricious and discriminatory conduct, Plaintiff is entitled under North Carolina law to injunctive relief requiring that his suspension and termination of privileges to perform interventional cardiology procedures at Moses Cone be reviewed and that a new decision be reached

34

based on the standard set by N.C. Gen. Stat. § 131E-85, which requires that such decisions shall be "on a non-discriminatory basis."

161.    Defendants' breaches of the contract have caused and will continue to cause actual and irreparable damage to Dr. Harwani because he cannot practice interventional cardiology procedures in Moses Cone, which is the only hospital where he had privileges, and Defendants have reported their adverse actions regarding Dr. Harwani's privileges to the National Practitioner Data Bank, which has the effect of causing other hospitals to deny him clinical privileges, and Defendants' have caused irreparable harm to Dr. Harwani's professional stature and reputation through their aggravated, discriminatory conduct alleged above.

162.    As a direct and proximate result of Defendants' breaches of contract, Dr. Harwani has suffered damages as may be proven at trial in an amount in excess of twenty-five thousand dollars.

## THIRD CLAIM: AGAINST MOSES CONE
### (in the alternative, Unfair and Deceptive Trade Practice)

163.    Plaintiff fully incorporates all preceding paragraphs by reference.

164.    The business of buying, developing, and selling real estate is an activity "in or affecting commerce" for the purposes of North Carolina Get. Stat. § 75–1.1.

165.    Moses Cone attempted to directly purchase Dr. Harwani's business property that is located directly across the street from the existing Moses Cone complex and in the midst of several other pieces of property that Moses Cone has purchased on that block.

Moses Cone, upon information and belief, has an interest in buying and developing the commercial real property Dr. Harwani owns.

166.   As an alternative to all of the racial animus and discrimination described and alleged above, Moses Cone may have engaged in its unfair and wrongful actions to improperly permanently strip Dr. Harwani's privileges to perform interventional cardiology procedures and to report him to the National Practitioner Database effectively destroying his reputation and ability to earn a living at Moses Cone or anywhere else in an effort to unfairly influence him to sell his commercial property in a deceptive manner.

167.   Upon information and belief, Moses Cone has used the same unfair and deceptive tactics and methods to ruin the business of other doctors of Indian ancestry and ethnicity who own commercial property near the Hospital and then purchase those commercial properties under circumstances that made it difficult or impossible for the non-white doctor to continue to have a viable medical practice after being unceremoniously and improperly stripped of privileges to practice at Moses Cone.

168.   If this was a factor in Moses Cone unfairly and improperly acting to destroy Dr. Harwani's reputation and business, this was an act taken in or affecting commerce in the process of buying, developing, and selling real estate.

169.   If this was a factor in Moses Cone unfairly and improperly acting to destroy Dr. Harwani's reputation and business, this was not an act related to the provision of professional services. Thus, if this this was a factor in Moses Cone unfairly and improperly acting to destroy Dr. Harwani's reputation and business, the mere fact that it happens to be a hospital and he happens to be a doctor does not implicate the professional services

36

exception to an Unfair and Deceptive Trade Practices claim under North Carolina law. Instead, this would be the type of business transaction in commerce that is contemplated and covered by of North Carolina Get. Stat. § 75–1.1.

170. If a factor in Moses Cone unfairly and improperly acting to destroy Dr. Harwani's reputation and business was to unfairly force him to sell his commercial property to Moses Cone so it could develop the property for its future expansion and capital campaign plans, these unfair and deceptive actions by Moses Cone have proximately and directly caused Dr. Harwani actual injury and great harm.

171. If Plaintiff proves this alternative claim related to Moses Cone's unfair and deceptive trade practices pursuant to North Carolina Get. Stat. § 75–1.1 et sequ., then he is entitled to all of the damages allowed by law to include trebling of any actual damages, costs, and attorneys' fees.

## FOURTH CLAIM: AGAINST ALL DEFENDANTS
### (Punitive Damages)

172. Plaintiff fully incorporates all preceding paragraphs by reference

173. As a direct and proximate result of the arbitrary, capricious, malicious, bad faith, grossly negligent, reckless, intentional, unfair, deceptive, discriminatory, or willful or wanton conduct of Defendants, as well as their conscious disregard of the rights of others, Plaintiff is entitled to recover punitive and exemplary damages to punish Defendants and to deter such conduct by others in an amount later to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays the Court for relief as follows:

1.      That Plaintiff have and recover of Defendants compensatory damages caused to Plaintiff in an amount to be determined at trial;

2.      That Defendant Moses Cone immediately reinstate all privileges that Plaintiff is, and always has been, entitled to by virtue of his compliance with the Bylaws and practice of medicine within the standard of care;

3.      That Plaintiff have and recover from Moses Cone all statutorily allowed damages pursuant to North Carolina Get. Stat. § 75–1.1 et sequ., to include trebling of any actual damages, costs, and attorneys' fees in an amount to be determined at trial or as otherwise allowed by law;

4.      That Plaintiff have and recover of Defendants punitive damages in an amount to be determined at trial;

5.      That Plaintiff have and recover from Defendants the costs of this action, applicable pre- and post-judgment interest, and all reasonable attorney's fees to the fullest extent allowed by the laws of North Carolina and the United States;

6.      That all issues of fact be tried by a Jury, and Plaintiff hereby makes a demand for trial by Jury for any and all such issues to which it may apply; and

7.      That Plaintiff have and recover such other and further relief, both legal and equitable, which the Court deems just and proper.

This 24th day of June, 2021.

/s/ W. Ellis Boyle
W. Ellis Boyle
N.C. State Bar No. 33826
*Attorney for Plaintiff*
Knott & Boyle, PLLC
4800 Six Forks Road, Suite 100
Raleigh, NC  27609
Telephone:  919-783-5900
Facsimile:  919-783-9650
Email:  ellis@knottboyle.com

39