FILED
in the Middle District of
North Carolina

February 28, 2023
8:23 pm

Clerk, US District Court
By: _____ kg _____

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MOHAN N. HARWANI, M.D.,  )
           )
    Plaintiff,    )
           )
    v.       )   Case No. 1:21CV522
           )
THE MOSES H. CONE MEMORIAL )
HOSPITAL OPERATING    )
CORPORATION and     )
JONATHAN J. BERRY, M.D.   )
           )
    Defendants.   )

RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

   This matter is before the Court on a Motion to Dismiss [Doc. #28] filed by the Moses

H. Cone Memorial Hospital Operating Corporation ("Moses Cone") and Jonathan J. Berry

("Dr. Berry") (collectively "Defendants").  According to the Amended Complaint [Doc. #22],

Dr. Mohan Harwani ("Plaintiff") maintained privileges to practice diagnostic and

interventional cardiology at Moses Cone from 1996 until July 2019.  Plaintiff filed the instant

matter in response to the termination of his privileges to perform interventional cardiology

procedures at Moses Cone in July 2019.  Defendants move to dismiss the Amended Complaint

in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6) for failing to state a claim.

As set out further below, it is recommended that Defendants' Motion to Dismiss be granted

in part and denied in part.

# I. FACTS, CLAIMS, AND PROCEDURAL HISTORY

Plaintiff alleges that he is a physician who is board certified in the field of cardiovascular disease and that he maintained privileges for admitting and performing both diagnostic and interventional cardiology procedures at Moses Cone for approximately 23 years. (Compl. [Doc. #22] ¶¶ 6–7.) According to the Complaint, Plaintiff's privileges to perform interventional cardiology procedures at Moses Cone was terminated as a result of race discrimination. Plaintiff alleges that over the course of the past twenty years, he has been subjected to discriminatory acts at the hand of Defendants, specifically by Defendant Dr. Berry in his role as Chair of the Cardiovascular Section at Moses Cone and in his role as the Chairman of the Moses Cone Peer Review Committee. (Compl. ¶ 17.) According to Plaintiff, Dr. Berry has launched recurrent unfounded accusations questioning Plaintiff's professionalism and patient care, which Plaintiff repeatedly overcame until July 2019. Plaintiff summarizes at length that history of repeated accusations and investigations instigated by Dr. Berry, and Plaintiff asserts that despite that excessive scrutiny none of those earlier accusations and investigations showed any significant findings or any medical treatment by Plaintiff that deviated from the standard of care. (Compl. ¶45.) Plaintiff further notes that Dr. Berry has not undertaken ongoing accusations or investigations against any non-white cardiologists, and Plaintiff identifies another cardiologist of Indian ethnicity, Dr. Ajay Kadakia, who Plaintiff alleges was investigated for similarly unfounded reasons and stripped of his privileges in a similar discriminatory fashion while Dr. Berry was Chief of Cardiology. (Compl. ¶49.)

Per the Complaint, Plaintiff's privileges to perform interventional cardiology procedures was terminated after a cardiology procedure he performed on July 13, 2019 ("July 13th

2

procedure"). The procedure at issue was an interventional procedure that involved a "Spontaneous Coronary Artery Dissection (SCAD) in the setting of ST-segment elevation myocardial infarction (STEMI), requiring the placement of five stents" after assessing the patient. (Compl. ¶ 53.) Plaintiff alleges that during this procedure, Dr. Berry entered the catheterization lab where Plaintiff was performing the procedure on two separate occasions and discussed certain aspects of the procedure with Plaintiff but made no statement indicating that there was an issue or concern with Plaintiff's course of treatment. (Compl. ¶¶ 57, 63.) The Complaint alleges that despite Defendant Berry's inaction during the procedure, Dr. Berry left the procedure room while Plaintiff was conducting the procedure and spoke with the President of Medical and Dental Staff in an effort to get Plaintiff's privileges suspended. (Compl. ¶¶ 63, 99.)

Two days later, on July 15, 2019, the Medical Executive Committee ("MEC") suspended Plaintiff's privileges to perform interventional and diagnostic cardiology procedures and appointed a team of physicians to investigate Plaintiff's actions during the July 13th procedure. (Compl. ¶ 65.) Plaintiff alleges that the process was used as a pretextual justification of discriminatory actions being taken against him and that he was not truly afforded due process. (Compl. ¶¶ 69–76.) Plaintiff alleges that Dr. Berry did not provide the investigative committee with a complete record of all pertinent information, and instead withheld relevant information and presented information to the committee in a skewed and incomplete fashion because he sought a particular outcome from the doctors on the investigative committee. (Compl. ¶¶ 71–76.)

Plaintiff identifies a white doctor, Dr. Kelly, who performed the same procedure Plaintiff performed under similar circumstances while Dr. Berry was the Chair of Cardiology. (Compl. ¶ 77.) Plaintiff alleges that Dr. Berry and Moses Cone did not investigate, punish, nor terminate the white doctor for his similar decided course of treatment. (Compl. ¶ 77.) Instead, Dr. Kelly was asked to teach other interventional cardiologists that the interventional procedure was the standard of care of Moses Cone for that type of patient presentation during a continuing medical education session. (Compl. ¶ 77.) Plaintiff alleges that he attended Dr. Kelly's presentation for standard of care, and that the procedure Dr. Kelly taught was the exact procedure Plaintiff performed during the July 13th procedure when his patient presented with the same diagnosis. (Compl. ¶ 78.)

Plaintiff alleges that on July 25, 2019, as a result of the internal review, Defendants suspended his privileges to perform interventional cardiology procedures but restored his privileges to perform diagnostic cardiology procedures. (Compl. ¶ 83.) Plaintiff was informed that this decision was made on the basis of "concerns relative to clinical judgment, medical management, and communications with the Cardiovascular Laboratory staff that could place patients in imminent danger." (Compl. ¶ 84.) Now, Plaintiff must refer his patients to another doctor if he assesses that there is a need for intervention. (Compl. ¶ 86.)

Plaintiff requested a hearing to contest the suspension of his privileges to perform interventional cardiology procedures. (Compl. ¶ 87.) An evidentiary hearing was conducted, and Plaintiff was able to call witnesses and provide opinion letters from other interventional cardiologists. (Compl. ¶¶ 92–95.) Ultimately, the hearing panel concluded that the MEC should offer Plaintiff a path to reinstatement of full privileges. (Compl. ¶¶ 98, 101.) However,

4

the MEC rejected the recommendation that Plaintiff be permitted a path to reinstatement of full privileges. (Compl. ¶¶ 102, 103.) The matter then went before the Moses Cone Board of Trustees, which affirmed the MEC's decision to terminate Plaintiff's interventional cardiology privileges. (Compl. ¶ 103.) Plaintiff appealed the Board of Trustee's decision. (Compl. ¶ 104.) The Appellate Review Committee affirmed the Board of Trustees' decision to terminate Plaintiff's interventional cardiology privileges on the basis that Plaintiff "continues to demonstrate a lack of self-awareness of his communication issues, poor patient selection for interventional cases and poor management of interventional case, which [ ] resulted in patient harm." (Compl. ¶ 105.) Plaintiff alleges that this finding was a result of the committee ignoring relevant facts due to racial animus. (Compl. ¶ 105.) Specifically, Plaintiff alleges that the determination did not align with the treatment of white doctors who were faced with similar circumstances and undertook similar actions, including Dr. Kelly specifically. (Compl. ¶ 105.) Plaintiff further alleges that the investigation and review were under the control or influence of Dr. Berry and were orchestrated by Dr. Berry as Chief of Cardiology and Chairman of the Peer Review Committee, and that under Dr. Berry white cardiologists were not similarly investigated but Plaintiff and the other cardiologist of Indian ethnicity, Dr. Kadakia, were subject to unfounded investigations and unfairly stripped of privileges. (Compl. ¶49, ¶99.) On June 26, 2020, the Board of Trustees voted to uphold its decision to terminate Plaintiff's privileges to perform interventional cardiology procedures. (Compl. ¶ 106.) Plaintiff alleges that the investigation procedure he underwent, and ultimate termination of interventional cardiology privileges for his treatment during the July 13th

5

procedure, was unfair and in violation of Moses Cone's Bylaws, which served as a contract between Moses Cone and Plaintiff. (Compl. ¶¶ 92, 96, 116.)

On June 24, 2021, Plaintiff filed the instant suit alleging racial discrimination in violation of 42 U.S.C. § 1981 and breach of contract in violation of N.C. Gen. Stat. § 131E-85 against both Defendants. In the alternative, Plaintiff raises a claim of Unfair and Deceptive Trade Practices in violation of N.C. Gen. Stat. § 75-1.1 against Moses Cone. Finally, Plaintiff raises a claim for punitive damages against both Defendants. Defendants moved to dismiss Plaintiff's initial complaint, and the Court allowed Plaintiff to amend the Complaint. Plaintiff then filed an Amended Complaint [Doc. # 22], which now serves as the operative Complaint in the case.

Defendants now move to dismiss Plaintiff's Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants argue that "Plaintiff's § 1981 claim should be dismissed because the Complaint does not establish that race is the but-for cause of the termination of Dr. Harwani's privileges." (Mot. to Dismiss [Doc. #28] ¶ 10.) Defendants also argue that the Bylaws provide for immunity and waive of claims as to "the actual decisionmakers, committees, and individuals who decided to terminate Plaintiff's privileges." (Mot to Dismiss ¶ 11.) With respect to Plaintiff's breach of contract claim, Defendants argue that it should be dismissed if the § 1981 claim is dismissed because the Court should decline to exercise supplemental jurisdiction, and that even if the Court did consider the claim, the Complaint fails to allege any provision in the Bylaws that was not followed or describe how the Bylaws were breached. (Mot. to Dismiss ¶¶ 12-13.) Defendants also argue that Plaintiff's unfair and deceptive trade practices claim should be dismissed pursuant to the statutory

6

exemption for services rendered by a member of a learned profession. (Mot. to Dismiss ¶ 14.) Finally, Defendants argue that because Plaintiff's Complaint fails to meet the state or federal pleading standard, Plaintiff's punitive damages claim should be dismissed. (Mot. to Dismiss ¶ 15.)

## II.    LEGAL STANDARD AND SCOPE OF REVIEW

Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), contending that Plaintiff has failed to state a claim upon which relief can be granted. A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure "challenges the legal sufficiency of a complaint," including whether it meets the pleading standard of Rule 8(a)(2). Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009). Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

This standard does not require "detailed factual allegations," but it demands more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. A claim is facially plausible when the plaintiff provides enough factual content to enable the court to reasonably infer that the defendant is liable for the misconduct alleged. Id. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. In this way, Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegations "to raise a right to relief above the

7

speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible." Twombly, 500 U.S. at 555, 570; see Iqbal, 556 U.S. at 680. Because a Rule 12(b)(6) motion tests the sufficiency of a complaint without resolving factual disputes, a district court "must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., 684 F.3d 462, 467 (4th Cir. 2012) (citation and internal quotation marks omitted). The Court must accept as true all of the factual allegations contained in a complaint, but is not bound to accept legal conclusions. Iqbal, 556 U.S. at 678. Thus, "when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679.

## III.  DISCUSSION

### A.  Plaintiff's Discrimination Claim under 42 U.S.C. § 1981.

Congress passed § 1981 to "guarantee[] to all persons in the United States 'the same right ... to make and enforce contracts ... as is enjoyed by white citizens.'" Nadendla v. WakeMed, 24 F.4th 299, 305 (4th Cir. 2022) (quoting Spriggs v. Diamond Auto Glass, 165 F.3d 1015, 1017 (4th Cir. 1999)). Section 1981 provides that "to make and enforce contracts" includes "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981.

"To succeed on a § 1981 claim, 'a plaintiff must ultimately establish both that the defendant intended to discriminate on the basis of race, and that the discrimination interfered with a contractual interest.'" Nadendla, 24 F.4th at 305 (quoting Denny v. Elizabeth Arden

8

<u>Salons, Inc.</u>, 456 F.3d 427, 434 (4th Cir. 2006)). A plaintiff must also show that the interference with a contractual interest would not have happened "but for" the plaintiff's race. <u>Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media</u>, 140 S. Ct. 1009, 1019 (2020); <u>see also</u> <u>Nadendla</u>, 24 F.4th at 305. More specifically stated, to state a § 1981 race-discrimination claim, a plaintiff must allege facts making it plausible "that, but for race, [he] would not have suffered the loss of a legally protected right" under the statute. <u>Comcast Corp.</u>, 140 S. Ct. at 1019; <u>see also</u> <u>Ali v. BC Architects Engineers, PLC</u>, 832 F. App'x 167, 171 (4th Cir. 2020) (per curiam) (unpublished), as amended (Oct. 16, 2020).[1] Thus, to survive a motion to dismiss, a plaintiff must allege facts that, if accepted as true, allow the court to draw a reasonable inference as to those legal requirements. <u>Nadendla</u>, 24 F.4th at 305.[2]

Defendants contend that Plaintiff's 42 U.S.C. § 1981 racial discrimination claim should be dismissed because the Complaint does not establish that race is the "but-for" cause of the

_____

[1] As observed by the Supreme Court in a case decided after the decision in <u>Comcast</u>, "but for" causation "is established whenever a particular outcome would not have happened 'but for' the purported cause." <u>Bostock v. Clayton County</u>, 140 S. Ct. 1731, 1739 (2020).

> In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause. This can be a sweeping standard. Often, events have multiple but-for causes. So, for example, if a car accident occurred both because the defendant ran a red light and because the plaintiff failed to signal his turn at the intersection, we might call each a but-for cause of the collision. . . . When it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision. So long as the plaintiff 's sex was one but-for cause of that decision, that is enough to trigger the law.

<u>Id.</u> (internal citations omitted).

[2] The Fourth Circuit has previously held that a plaintiff may ultimately prove a race-discrimination claim under § 1981 through direct or circumstantial evidence showing that an adverse employment action was caused by intentional discrimination aimed at the plaintiff's race, or through the "burden-shifting framework" of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>Guessous v. Fairview Prop. Inv., LLC</u>, 828 F.3d 208, 216 (4th Cir. 2016). The <u>McDonnell Douglas</u> test has been used as a "tool for assessing claims, typically at summary judgment, when the plaintiff relies on indirect proof of discrimination." <u>Comcast Corp.</u>, 140 S. Ct. at 1019. In <u>Comcast</u>, the Supreme Court did not resolve the question of "[w]hether or not <u>McDonnell Douglas</u> has some useful role to play in § 1981 cases," <u>Comcast</u>, 140 S. Ct. at 1019, and this Court need not resolve that

termination of Plaintiff's privileges. (Defs.' Br. [Doc. #29] at 11.) Defendants contend that the Complaint fails to explain how alleged differential treatment towards white and non-white physicians were unjustified, or how the Bylaws were applied differently to non-white physicians. (Defs.' Br. at 12-13.) Defendants argue that Plaintiff "baldly alleges that Plaintiff's race was the "but-for" factor in Defendants' decision to terminate his privileges because other non-white doctors were treated differently," but has not alleged any facts of how the comparator physicians were treated differently and instead "merely recites the elements of a cause of action without specific supporting facts." (Defs.' Br. at 14.) Finally, Defendants argue that because the Complaint includes non-race-based alternative explanations for the decision to terminate Plaintiff's privileges, "racial animus cannot be the 'but for cause'" of the alleged discriminatory conduct. (Defs.' Br. at 14.)

In considering these contentions, the Court notes that Plaintiff expressly alleges that his "race and ethnicity was the but-for motivating factor in Defendants' . . . decision to suspend, terminate, and deny Plaintiff clinical privileges to practice interventional cardiology at Moses Cone." (Compl. ¶ 119.) Plaintiff further alleges that "[b]ut for Plaintiff's race and non-white ethnicity, Defendants' wrongful conduct against Plaintiff would not have occurred" and that "Defendants' refusal to perform the contract with [Plaintiff] in a fair manner and in good faith was motivated by race, and but for this racial animus and [Plaintiff's] non-white ethnicity, Defendants would have fairly and properly applied their contractual obligations." (Compl. ¶¶ 122, 151.) With respect to these allegations, Defendants assert that these are

_____

question at this stage in the case, since any consideration of that issue would be for consideration on motions for summary judgment.

conclusory allegations similar to the allegations in the Fourth Circuit's recent decision in Nadendla, 24 F.4th at 305. In Nadendla, the Fourth Circuit upheld the district court's determination that a plaintiff did not plausibly allege that race was a but-for cause of loss of privileges. (Defs.' Br. at 11-12.) The Fourth Circuit explained that the plaintiff's complaint lacked "factual details regarding race" and made only general statements regarding the different treatment of physicians of Indian descent versus those who are Caucasian. Nadendla, 24 F.4th at 305. The Fourth Circuit went on the explain that

> Nadendla provides no details about any of these conclusory allegations. For example, she does not give any facts to suggest that WakeMed's treatment of other physicians of Indian descent was unjustified. She does not provide any details about how the peer review process for physicians of Indian descent was different from the process for white physicians either. She does not even describe how she was treated differently than the similarly situated white physicians.

Id. at 305-306. However, the Fourth Circuit distinguished (and did not disavow) its prior decision in Woods v. City of Greensboro, 855 F.3d 639 (2017). In Woods, the Fourth Circuit held that the plaintiff had alleged sufficient facts to plausibly allege a 1981 discrimination claim. In the later decision in Nadendla, the Fourth Circuit noted that the allegations were sufficient in Woods because the plaintiff had alleged the results of a disparity study, facts suggesting that the plaintiff had satisfied the requirements, and examples of how the defendant had treated nonminority businesses differently. Nadendla, 24 F.4th at 306. The Fourth Circuit noted that, in contrast, the allegations in Nadendla's complaint were "only vague and conclusory" and "[w]ithout factual detail" and were ultimately "mere recitals of elements of a cause of action,

11

which, without specific facts supporting those elements, do not state a plausible claim for relief." Id.

Thus, the question here is whether Plaintiff's allegations are closer to the allegations in Woods, which were sufficiently detailed to raise a plausible § 1981 claim, or are closer to the allegations in Nadendla, which were not sufficient to raise a plausible § 1981 claim. On initial review, the underlying factual scenario is similar to Nadendla, involving an alleged loss of privileges by a physician. However, a review of the complaint in Nadendla is helpful in considering the specific allegations. (See Nadendla v. WakeMed, 5:18-cv-00540, Compl. (E.D.N.C. November 14, 2018).) Notably, in the complaint in Nadendla, the plaintiff there did not allege race discrimination by any specific individual, and the only individuals named as being responsible for the termination of privileges were two doctors in a competing practice, one of whom was the department chief, who were specifically alleged to have acted for financial reasons growing out of a business dispute, not any racially discriminatory reason. (See Nadendla v. WakeMed, 5:18-cv-00540, Compl. ¶75-87 (E.D.N.C. November 14, 2018) (alleging specifically that the suspension of the plaintiff was "financially motivated and driven by the ulterior motivations of her direct and influential competitors, including but not limited to Drs. Grana and Sheshadri and their practice, 'Triangle Physicians for Women,' who stood to gain financially by removing Dr. Nadendla from the market of OB/GYN physicians caring for patients in Cary, North Carolina and surrounding communities.") In addition, the complaint in Nadendla did not identify any other minority physicians who were similarly treated. Even more notably, the complaint did not identify any white physicians who were treated differently. Instead, the complaint simply included conclusory allegations, without any

12

factual basis or support, that plaintiff's suspension was "also motivated by racial and ethnic bias", that she was treated differently than Caucasian physicians, and that minority physicians were scrutinized more harshly. (See Nadendla v. WakeMed, 5:18-cv-00540, Compl. ¶88-104 (E.D.N.C. November 14, 2018).)

In contrast, in the Complaint in the present case, Plaintiff alleges specific examples of how similarly situated Caucasian physicians were treated differently than he was on the basis of race, which go beyond the general pleadings found in Nadendla. For example, Plaintiff specifically alleges that Dr. Kelly performed the same procedure that Plaintiff did in a similar clinical setting and was treated differently. (Compl. ¶ 77.) Plaintiff alleges that Defendants did not "investigate, punish, terminate, or focus review on this white doctor's actions," rather, they "asked him to teach the other interventional cardiologists that this was the standard of care at Moses Cone for that type of patient presentation." (Compl. ¶ 77.) According to Plaintiff, he attended the presentation and did the exact same procedure that Dr. Kelly had done. (Compl. ¶ 78.) Plaintiff also alleges that he is not the only interventional cardiologist who has missed a diagnosis of SCAD and that Caucasian physicians who had missed a diagnosis of SCAD at Moses Cone had "received different, much more lenient and preferential treatment." (Compl. ¶ 80–81.) Plaintiff makes these arguments in the context of race being the factor distinguishing the treatment on all of these occasions. Plaintiff also identifies another cardiologist of Indian descent, Dr. Kadakia, who was also subjected to unfounded investigation and suspension while other white cardiologists were not. And, notably, Plaintiff identifies Dr. Berry as the Chief of Cardiology acting with racially discriminatory intent, and summarizes a years-long effort by Dr. Berry to investigate Plaintiff over incidents that were

13

uniformly determined to be unfounded and within the standard of care, until the June 2019 incident when Dr. Berry provided incomplete and skewed information in an effort to orchestrate Plaintiff's suspension. Such allegations are not vague and conclusory "labels, conclusions, recitations of a claim's elements and naked assertions devoid of further factual enhancement," that do not meet the Rule 8 standard. See ACA Fin. Guar. Corp. v. City of Buena Vista, 917 F.3d 206, 211 (4th Cir. 2019). Of course, Defendants contest these allegations, deny that Dr. Berry ever acted with discriminatory intent, contest Dr. Berry's ability to control or influence the ultimate determination in any event, and deny that Dr. Berry provided false or intentionally incomplete information to effect the termination of privileges. It will ultimately be up to Plaintiff to present evidence to support his claims, but taking the facts as true as the Court must at this stage, these allegations are closer to the allegations in Woods than the conclusory allegations in Nadendla, and at this early stage are sufficient to state a plausible claim for relief.[3]

The Court notes that Defendants also argue that "the Amended Complaint includes alternative, non-race-based explanations for [terminating Plaintiff's privileges]." (Defs.' Br. at 14.) Specifically, Defendants identify references to an alleged history of clinical concerns noted in the Complaint. However, these references in the Complaint are simply Plaintiff's recitation of the reasons given for the termination, which Plaintiff contends were a pretext for discrimination, and Plaintiff has alleged specific facts to at least plausibly allege that those

---

[3] The Court notes that this determination is a close one, and the law in this area is still evolving in the wake of the decisions in Comcast and Nadendla. See Comcast, 140 S. Ct. at 1019; Nadendla, 24 F.4th at 305. However, given the difference between the allegations in this case and the allegations in Nadendla, dismissal here would be a step beyond Nadendla. In the circumstances, resolution after a period of discovery appears appropriate, and the Court can limit discovery as necessary to ensure that it is not overly broad or unduly burdensome.

14

contentions were unfounded. Attempting to resolve this dispute goes beyond a motion to dismiss, and can more appropriately be considered after discovery on dispositive motions.

Defendants also contend that Plaintiff's claim in the alternative in Count Three is evidence of an allegation of a mixed-motive reasoning for the termination of his privileges. However, Plaintiff's claim in Count Three is a separate alternative claim against Moses Cone and does not involve Dr. Berry. Notably, Plaintiff does not allege any other motivation by Dr. Berry, other than race discrimination. A "but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." Bostock, 140 S. Ct. at 1739. Plaintiff has not asserted a mixed motive and has not alleged facts to reasonably infer any other motive by Dr. Berry other than race discrimination. Plaintiff does allege alternative claims against Mosses Cone in Count Three for unfair and deceptive trade practice, and the Court can separately consider the alternative claim against Moses Cone below.[4] At this stage, reviewing the facts as pleaded as true and in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, the Court concludes that Plaintiff has

---

[4] Defendants concede that a plaintiff may plead claims in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2), but argue that "a plaintiff cannot allege a new set of facts, that are not pled in the alternative, that provide an alternative motivation for the factual allegations that negate the 'but for' causation standard." (Defs.' Br. at 14.) However, Plaintiff here alleges a single motivation by Dr. Berry—race discrimination against the cardiologists in his department of Indian descent—and an investigation and determination under Dr. Berry's influence and control and affected by his presentation of false and incomplete facts. Plaintiff's claims against Moses Cone in Count Three are specifically alleged in the alternative. Thus, this case is distinguishable from the cases cited by Defendants, in which the plaintiffs asserted termination as a result of sex discrimination and race discrimination, in addition to age discrimination and retaliation.

alleged facts sufficient to allege a § 1981 claim for race discrimination, and that further analysis of these issues is more appropriate on dispositive motions after discovery.

B. Defendants' Claim of Immunity under the Bylaws.

Defendants next argue that all of Plaintiff's claims should be dismissed pursuant to an immunity and waiver of claims provision found within the Bylaws.[5] Defendants contend that "[u]nder the Bylaws, Plaintiff agreed to release and make immune the 'Corporation' and any 'Representative' in relation to 'any statement, recommendation, or other action or omission, taken or made…without malice.'" (Defs.' Br. at 15.) Defendants point to Sections 13.1(c) and 13.4(a) of the Bylaws in support of their contention that any participant in the medical review process is cloaked in immunity for actions taken in their roles. (Defs.' Br. at 15 (citing to Bylaws §13.1 and §13.4 [Doc. #28-1 at 12-14]).) Section 13.4 of the Bylaws is titled "IMMUNITY from LIABILITY" and provides:

> (a) **For Actions or Omissions**. Neither a Representative nor the Corporation shall be liable for damages or other relief for any statement, recommendation, or other action or omission, taken or made by a Representative in Representative capacity <u>without Malice</u>. Regardless of any provisions of state law to the contrary, truth shall be an absolute defense in all circumstances.

---

[5] Generally, on a motion to dismiss, courts are limited to consideration of the facts stated in the complaint or in documents attached to the complaint, and consideration of facts outside the complaint converts the motion to dismiss into a motion for summary judgment. See Fed. R. Civ. P. 12(b) & 10(c). However, a court may consider the contents of documents not attached to the complaint, but brought forth on a motion to dismiss, where the documents are referred to in the complaint and are integral to the plaintiff's complaint and the plaintiff does not challenge its authenticity. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016). In the instant matter, Plaintiff's Complaint alleges that "[t]he terms of the Medical Staff Bylaws, policies and procedures form a valid and enforceable contract between [Plaintiff] and Moses Cone Hospital" and that Moses Cone's complained of actions constituted a breach of that contract. (Compl. ¶¶ 15–16.) Plaintiff then references the Bylaws throughout his Complaint. Plaintiff's breach of contract claim relies upon the terms and effects of the Bylaws. Further, Plaintiff does not challenge the authenticity of the Bylaws that Defendants attach to their brief in support of their motion.

16

(Bylaws § 13.4 (emphasis added).) Section 13.1 of the Bylaws defines Malice as follows:

> **(b) "Malice"** means the dissemination of a knowing falsehood, or of information with a reckless disregard for whether it is true or false. A person who acts, or fails to act, on the basis of an actual belief that an action, statement or recommendation is warranted by the facts, even though such belief is unreasonable, acts without Malice.

(Bylaws § 13.1.) Defendants also point to Section 13.7 of the Bylaws, which provides that the immunity and/or confidentiality afforded by, *inter alia*, North Carolina General Statute § 131E-95 extends to a medical review committee. Pursuant to North Carolina General Statute § 131E-95,

> A member of a duly appointed medical review committee who acts <u>without malice or fraud</u> shall not be subject to liability for damages in any civil action on account of any act, statement or proceeding undertaken, made, or performed within the scope of the functions of the committee.

N.C. Gen. Stat. Ann. § 131E-95(a) (emphasis added). For purposes of this statutory provision,

> Malice is defined as: The intentional doing of a wrongful act without just cause or excuse, with an intent to inflict an injury or under circumstances that the law will imply an evil intent. A condition of mind which prompts a person to do a wrongful act willfully, that is, on purpose, to the injury of another, or to do intentionally a wrongful act toward another without justification or excuse. The North Carolina Supreme Court states "malice in law" is presumed from tortious acts, deliberately done without just cause, excuse, or justification, which are reasonably calculated to injure another or others.

Phillips v. Pitt County Memorial Hosp. Inc., 222 N.C. App. 511, 524–25, 731 S.E.2d 462 (2012) (internal quotations omitted).

Thus, under both Bylaw 13.4 and Bylaw 13.7 (incorporating N.C. Gen. Stat. § 131E-95(a)), the immunity is contingent on a lack of malice. However, Plaintiff notes that the Bylaws only provide immunity to the extent "permitted by such law," and would not provide immunity for actions taken with discriminatory intent. Further, in the instant matter, Plaintiff's

17

Complaint is premised upon allegations of consistent racially discriminatory actions that can be construed to rise to the level of malice. Plaintiff alleges that Dr. Berry engaged in years of harassment and repeated unfounded investigations against Plaintiff based on his race. (Compl. ¶¶ 26, 39, 99.) Plaintiff further alleges that Dr. Berry misrepresented facts to the MEC in an effort to discriminate against him and set the basis for the MEC to reach an unfavorable decision regarding his privileges. (Compl. ¶ 23.) Plaintiff also alleges that during the review process Defendants "improperly created or encouraged the creation of misleading evidence"; "improperly withheld evidence"; and "cherry picked unreliable and misleading bits and pieces to present" to the review committee. (Compl. ¶¶ 138, 140, 141.) These facts support Plaintiff's contention that Defendants engaged in "dissemination of a knowing falsehood, or of information with a reckless disregard for whether it is true or false" to constitute malice under the Bylaws. These facts also support Plaintiff's contention that Dr. Barry intentionally engaged in discrimination, with an intent to inflict an injury, to constitute malice under § 131E-95. Moreover, not only does Plaintiff plead actions that the Court can reasonably interpret to be malice, he also expressly alleges "[it is his] belief and understanding that Defendants acted in bad faith and with malice in suspending and terminating his privileges to perform interventional cardiology procedures." (Compl. ¶ 127.) Plaintiff also alleges that Defendants "maliciously misused the peer review process." (Compl. ¶ 146.)

In reviewing the allegations in the Complaint in the light most favorable to Plaintiff, this Court finds that Plaintiff has plausibly alleged that Defendants acted with malice, and as such, he is not barred from bringing his claims against Defendants under the terms of the

Bylaws or § 131E-95.[6]  Therefore, Defendants Motion to Dismiss on this basis should be denied at this stage of the litigation.[7]

        C.  Claim for Breach of Contract

      Defendants next argue that Plaintiff's second claim, which raises a state law claim for breach of contract, fails to state a claim upon which relief can be granted.[8]  North Carolina courts have held that a hospital's offer of privileges, if accepted by a physician, may be a contract that incorporates the terms of the hospital bylaws.  Virmani v. Presbyterian Health Services Corp., 127 N.C. App. 71, 76-77, 488 S.E.2d 284, 288 (1997).  To sufficiently allege a breach of contract claim under North Carolina law, the essential elements are: (1) the existence of a valid contract and (2) a breach of the terms of that contract.  Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enterprises, Inc., 505 F. Supp. 3d 570, 583 (M.D.N.C. 2020).

---

[6] Defendants also make reference to the Health Care Quality Improvement Act ("HCQIA"), which similarly provides immunity to hospitals and doctors participating in the peer review process.  See 42 U.S.C. § 11111.  However, Defendants concede that by its terms, that protection under the HCQIA does not apply to damages "relating to the civil rights of any person or persons, including . . . the Civil Rights Acts, 42 U.S.C. 1981, et seq."  As noted by the Court of Appeals for the Fourth Circuit, "Congress created an express exception to the immunity provision in the case of civil rights actions" and "insofar as Congress has considered the competing interests, it has not elevated the interest in encouraging peer review over the interest in combating discrimination."  Virmani v. Novant Health Inc., 259 F.3d 284, 291-92 (4th Cir. 2001).

[7] Defendants similarly argue that the facts, as alleged, do not support a claim for punitive damages. The award of punitive damages "is an extraordinary remedy and is designed to punish and deter particularly egregious conduct." Stephens v. South Atlantic Canners, Inc., 848 F.2d 484, 489 (4th Cir.1988).  Under § 1981, punitive damages are available where a plaintiff demonstrates that the defendant's conduct was prompted by "malice or with reckless indifference to the federally protected rights" of the plaintiff. 42 U.S.C. § 1981a(b)(1).  Reviewing the facts as alleged in the light most favorable to the Plaintiff, Plaintiff has alleged as much here as discussed at length above.  Any further consideration of the damages available can be resolved later in the case, and need not be further addressed or resolved at this preliminary stage.

[8] Defendant also contends that the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law breach of contract claim if the § 1981 claim is dismissed.  As discussed above, Plaintiff has pleaded sufficient facts to state a claim for racial discrimination under § 1981, so this contention that the Court should decline to exercise supplemental jurisdiction is moot.

With respect to Dr. Berry, Defendants argue that the Complaint does not allege that Plaintiff and Dr. Berry were in an enforceable contract, and therefore Plaintiff cannot maintain a breach of contract claim against Dr. Berry. Indeed, the Complaint alleges that "[t]he terms of the Medical Staff Bylaws, policies, and procedures form a valid and enforceable contract between Dr. Harwani and Moses Cone Hospital." (Compl. ¶ 15.) The Complaint, on the other hand, does not allege that Dr. Berry and Plaintiff were parties to an enforceable contract, nor does Plaintiff make an argument to that effect in his response to Defendants' motion. As such, the Complaint fails to allege the first element—the existence of a valid contract—to establish a breach of contract with respect to Dr. Berry, and the breach of contract claim against Dr. Berry as an individual should be dismissed.

With respect to Moses Cone, Defendants focus their argument on the second element of a breach of contract claim, whether there was a breach in the terms of an enforceable contract. According to Defendants, "[t]o sufficiently allege a breach of contract action against Cone Health, Plaintiff must allege the specific provisions of the Bylaws that were breached and facts showing how the Bylaw provisions were violated." (Defs.' Br. at 18.) Defendants argue that the Complaint does not reference any Bylaw provision or describe how an applicable Bylaw provision was violated. (Defs.' Br. at 19.)

In the Complaint as to this Second Claim, Plaintiff alleges that the suspension and termination of his privileges constitute breach of contract because Defendants acted "with discriminatory intent." (Compl. ¶154.) Plaintiff specifically alleges that "[t]his is simply the state-law corollary claim that exists because of the first claim under 42 U.S.C. § 1981." (Compl. ¶154.) To the extent Defendants have included copies of the Bylaws as part of the Motion to

Dismiss, Plaintiff in his Response Brief cites specifically to Section 3.2(c) of the Bylaws, which provides:

> **(c)** Nondiscrimination. Staff membership or specific Clinical Privileges shall not be limited or denied on the basis of sex, race, creed, or national origin or on the basis of any other criterion unrelated to the delivery of good patient care at the Hospital, to professional qualifications, to the Hospital's purposes, needs and capabilities, or to the community's needs.

(Pl.'s Resp. [Doc. # 37] at 7 (citing Bylaws 3.2 [Doc. #27-1 at 20]).) Plaintiff in his Response does not specify any other provision of the Bylaws at issue, but his citation to the nondiscrimination provision of the Bylaws is consistent with his allegations in Claim Two of the Complaint asserting breach of contract "because Defendants acted with discriminatory intent." These allegations sufficiently identify the basis of the alleged breach of contract and the provision of the Bylaws at issue.

Claim Two also cites to N.C. Gen. Stat. § 131E-85, requesting that a new decision be reached based on the standard set out in that statute "on a non-discriminatory basis." Under § 131E-85, hospitals are directed to make determinations to grant or deny medical staff privileges "based upon the applicant's education, training, experience, demonstrated competence and ability, and judgment and character of the applicant, and the reasonable objectives and regulations of the hospital." N.C. Gen. Stat. § 131E–85(a). As part of the Motion to Dismiss, Defendants argue that the Complaint "fails to identify how Cone Health's Bylaws fail to comply with state law or that Cone Health failed to follow its own Bylaws." Defendants also argue that "[a]s long as the hospital's criteria are reasonably related to operation of the hospital and fairly administered, the courts should not intervene." (Defs.' Br. at 22 (citing <u>Cameron v. New Hanover Mem'l Hosp., Inc.</u>, 58 N.C App. 414, 449, 293 S.E.2d

21

901, 922 (1982); <u>Lohrmann v. Iredell Mem. Hosp.</u>, 174 N.C. App. 63, 77, 620 S.E.2d 258, 266 (2005)).) However, as discussed above, Plaintiff alleges that Defendants have not fairly administered the criteria for limiting and/or denying staff privileges, and specifically that the determination was made with racially discriminatory intent. Under § 131E-15, the "granting or denial of privileges to practice in hospitals . . . and the scope and delineation of such privileges shall be determined by the governing body of the hospital on a non-discriminatory basis." N.C. Gen. Stat. § 131E-85(a). As articulated above, Plaintiff has alleged that Defendants failed to follow the Bylaws and violated this statutory provision by acting in a racially discriminatory manner.

The Court therefore concludes that the allegations in the Complaint viewed in the light most favorable to Plaintiff are sufficient to state a claim for breach of contract and survive Defendants' Motion to Dismiss as it relates to Moses Cone. With respect to Dr. Berry, Plaintiff has not alleged that a contract existed between him and Dr. Berry. As such, the claim for breach of contract against Dr. Berry should be dismissed.

D. <u>Plaintiff's Unfair and Deceptive Trade Practices Act ("UDTPA") Claim</u>

Defendants argue that Plaintiff's Unfair and Deceptive Trade Practices claim should be dismissed because (1) interest in acquiring property "cannot be an unfair or deceptive act" and (2) the claim is barred under the statutory exemption for professional services rendered by a member of a learned profession. (Defs.' Br. at 23); Mot. to Dismiss ¶ 14.) Under North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), unfair methods of competition and unfair or deceptive acts or practices, in or affecting commerce, are unlawful. N.C. Gen. Stat. § 75-1.1(a). To establish a prima facie claim under the UDTPA, a plaintiff

22

must demonstrate that: 1) that the defendant committed an unfair or deceptive act or practice; (2) in or affecting commerce; and (3) that the plaintiff was injured thereby. TSC Research, LLC v. Bayer Chem. Corp., 552 F. Supp. 2d 534, 546 (M.D.N.C. 2008); see also Dalton v. Camp, 548 S.E.2d 704, 711 (N.C. 2001). An "unfair" practice is one that is "unethical or unscrupulous," and an act is deceptive "if it has a tendency to deceive." Dalton, 548 S.E.2d at 711 (citing Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir. 1987)). The UDTPA defines "commerce" broadly as "all business activities, however denominated...." N.C. Gen. Stat. § 75-1.1(b).

Plaintiff alleges that Moses Cone has engaged in activity that violates the act in that it engaged in wrongful actions pertaining to Plaintiff's employment to interfere with his ability to earn a living through practicing interventional cardiology in an effort to "unfairly influence him to sell his commercial property in a deceptive manner." (Compl. at ¶ 166.) Defendants contend that Plaintiff's claim must fail because any allegation that Moses Cone terminated Plaintiff's privileges in order to upend his private practice for the purpose of expanding Moses Cone's operation would "certainly fall under [the learned profession] exemption" afforded under N.C. Gen. Stat § 75-1.1. (Defs.' Br. at 24.) Plaintiff responds that his "UDTPA claim has nothing to do with rendering professional services" rather "it relates to Defendant Moses Cone's improper attempt to hurt him to gain a favorable opportunity to buy his property that [Moses Cone] wants to use in future development of its campus." (Pl.'s Resp. at 10.)

N.C. Gen. Stat. § 75-1 expressly excludes from its scope "professional services rendered by a member of a learned profession." N.C. Gen. Stat. § 75-1.1(b). Indeed, "North Carolina courts agree 'that unfair and deceptive acts committed by medical professionals are not

23

included within the prohibition of N.C.G.S. § 75-1.1(a).'" McClean v. Duke Univ., 376 F.

Supp. 3d 585, 610 (M.D.N.C. 2019) (quoting Gaunt v. Pittaway, 139 N.C. App. 778, 783-84,

534 S.E.2d 660, 664 (2000). As set out by the North Carolina Supreme Court:

> we conduct a two-part inquiry to determine whether the "learned profession" exemption applies: "[F]irst, the person or entity performing the alleged act must be a member of a learned profession. Second, the conduct in question must be a rendering of professional services." . . .

> In determining what sort of conduct is exempted, the Court of Appeals has also explained that "a matter affecting the professional services rendered by members of a learned profession . . . falls within the exception in N.C.G.S. § 75-1.1(b)."

Sykes v. Health Network Solutions, Inc., 372 N.C. 326, 334, 828 S.E.2d 467, 472 (2019)

(quoting Wheeless v. Maria Parham Med. Ctr., Inc., 237 N.C. App. 584, 589, 768 S.E.2d 119,

123 (2014) and Burgess v. Busby, 142 N.C. App. 393, 407, 544 S.E.2d 4, 11-12 (2001)). With

respect to medical professionals,

> [The North Carolina] Court of Appeals has long held that members of health care professions fall within the learned profession exemption to N.C.G.S. § 75-1.1, and "[t]his exception for medical professionals has been broadly interpreted."

Sykes, 372 N.C. at 334, 828 S.E.2d at 472 (quoting Shelton v. Duke Univ. Health Sys., Inc.,

179 N.C. App. 120, 126, 633 S.E.2d 113, 117 (2006)).

Notably, North Carolina courts have drawn a distinction between (1) professional

services rendered in connection with medical advice, medical treatment, or medical practice,

and (2) actions undertaken by a hospital or doctor during business negotiations. See, e.g.,

Hamlet H.M.A., LLC v. Hernandez, 262 N.C. App. 51, 59-64, 821 S.E.2d 600, 606-08 (2018)

("Defendant alleged that the hospital made false representations to induce him to enter into a

24

contract; the fact that he is a physician does not change the nature of the negotiation of a business contract.") Plaintiff contends that Claim Three falls in the latter category because it relates to Moses Cone's actions in the context of "[t]he business of buying, developing, and selling real estate." (Compl. ¶ 164.) Plaintiff points to the North Carolina Court of Appeals' language in Hamlet noting that:

> if a physician entered into a lease agreement for space in a medical office building owned by a group of physicians or hospital and then seeks to bring a UDTP claim based upon a dispute over the lease, it should be treated no differently than a similar lease arrangement for parties in any other business. The fact that medical services will be provided in the building does not mean that the lease arrangement arises from rendition of professional services and has no effect on the quality of the medical care provided.

Hamlet, 262 N.C. App. At 64, 821 S.E.2d at 608; see also Mason v. Health Mgmt. Assocs., LLC, 421 F. Supp. 3d 237 (W.D.N.C. 2019) (finding that the learned profession exception would not apply to a "garden-variety business dispute" unrelated to the provision of medical care).

However, in at least two cases, the North Carolina Court of Appeals has applied the learned profession exception to cases involving the granting or denial of hospital privileges, even where the alleged motivation for the action was financial. See Wheeless, 237 N.C. App. at 590-91, 768 S.E.2d at 123-24; Cameron v. New Hanover Memorial Hospital, 58 N.C. App. 414, 293 S.E.2d 901 (1982). Those decisions were later described by the Court of Appeals in Hamlet:

> In Wheeless, the plaintiff physician brought a claim against the hospital based upon the hospital's complaint to the Medical Board about care provided by the plaintiff physician, but this Court held making a complaint to the Medical Board

25

is integral to the hospital's role in providing medical care and thus falls within the exception.

. . . .

In <u>Cameron</u>, the plaintiffs were podiatrists who brought twelve different claims against the defendant hospital arising out of the hospital's denial of hospital staff privileges. . . . The claims included allegations based upon the hospital's bylaws and application process, civil conspiracy, interference with contractual rights, "unfair methods of competition and unfair practices" in violation of G.S. 75-1.1, slander, and libel. The Court noted that under the newly amended UDTP Act, the podiatrists' UDTP claims against the hospital would be barred by the learned profession exemption.

<u>Hamlet</u>, 262 N.C. App. at 61-62, 262 S.E.2d at 607 (citing <u>Wheeless</u>, 237 N.C. App. at 590-91, 768 S.E.2d at 123-24; <u>Cameron</u>, 58 N.C. App. at 445-46, 293 S.E.2d at 920-21). The North Carolina Supreme Court has endorsed the approach in <u>Wheeless</u>, describing it as an example of how the exemption for medical professionals has been broadly interpreted:

[I]n <u>Wheeless v. Maria Parham Medical Center, Inc.</u>, the Court of Appeals determined that the learned profession exemption barred a section 75-1.1 claim by a medical doctor against a hospital and individual physicians in which the plaintiff physician alleged that the defendants had made an anonymous complaint about him to the North Carolina Medical Board. The court rejected Wheeless's argument that the exemption did not apply "because, by 'illegally access[ing], shar[ing], and us[ing] Plaintiff's peer review materials and patients' confidential medical records out of malice and for financial gain for illegal improper purpose[,]'" defendants did not render professional services. Rather, the court viewed "defendants' alleged conduct in making a complaint to the Medical Board as integral to their role in ensuring the provision of adequate medical care"; accordingly, the learned profession exemption barred plaintiff's action.

<u>Sykes</u>, 372 N.C. at 334, 828 S.E.2d at 472 (internal citations omitted). Thus, an allegation of action motivated "out of malice and for financial gain for illegal improper purpose" is not sufficient to take a claim outside of the learned profession exemption.

Here, Plaintiff's claim is ultimately a challenge to the decision to terminate or suspend his privileges, which has been held to be an issue within the learned profession exemption

26

under the broad interpretation espoused by the North Carolina courts. Consistent with the decisions in <u>Wheeless</u> and <u>Cameron</u>, the fact that an anti-competitive or financial motive is alleged is not sufficient to take the case out of the exemption. Unlike <u>Hamlet</u> and <u>Mason</u>, this is not a garden variety business dispute. Therefore, taking the allegations in the Complaint as true, Plaintiff's Third Claim is barred by the learned profession exemption that applies to claims under N.C. Gen. Stat. 75.1-1 for unfair and deceptive trade practices. Therefore, Defendants' Motion to Dismiss should be granted as to this Third Claim.

## IV.   CONCLUSION

For the reasons set forth above, the Court will recommend that the Motion to Dismiss be granted in part and denied in part.

IT IS THEREFORE RECOMMENDED that Defendants' Motion to Dismiss [Doc. #28] be GRANTED in part and DENIED in part, specifically that Defendants' Motion to Dismiss be granted as it relates to Plaintiff's Second Claim for Breach of Contract against Defendant Berry and as it relates to the Third Claim for Unfair and Deceptive Trade Practices against Moses Cone, and that Defendant's Motion to Dismiss be denied as to the First Claim against both Defendants and the Second Claim for Breach of Contract against Defendant Moses Cone.

This, the 28th day of February, 2023.

_____/s/ Joi Elizabeth Peake_____<br>
United States Magistrate Judge