IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

FILED
in the Middle District of
North Carolina

March 27, 2025
1:11 pm

Clerk, US District Court
By: _____ kg _____

MOHAN N. HARWANI, M.D.,           )
                                  )
          Plaintiff,              )
                                  )
     v.                           )          1:21-CV-00522
                                  )
THE MOSES H. CONE MEMORIAL        )
HOSPITAL OPERATING                )
CORPORATION, et al.,              )
                                  )
          Defendants.             )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on a Motion for Summary Judgment filed by the Moses H. Cone Memorial Hospital Operating Corporation ("Moses Cone") and Jonathan J. Berry ("Dr. Berry") (collectively, "Defendants"). Dr. Mohan Harwani ("Plaintiff") maintained privileges to practice diagnostic and interventional cardiology at Moses Cone from 1996 until July 2019. In July 2019, Plaintiff's privileges to perform interventional cardiology procedures were temporarily suspended, and were ultimately terminated by Moses Cone's Board of Trustees in June of 2020. Plaintiff subsequently filed the instant lawsuit alleging that the termination of his privileges was the result of racial discrimination in violation of 42 U.S.C. § 1981 and North Carolina General Statute § 131E-85 and in violation of Mose Cone's Bylaws. In the present Motion for Summary Judgment, Defendants contend that there is no evidence of racial discrimination and that Plaintiff's privileges were terminated for non-discriminatory reasons. As is further set out below, it is recommended that Defendants' Motion for Summary Judgment be granted, and that the case be dismissed with prejudice.

I.     FACTS, CLAIMS, AND PROCEDURAL HISTORY

A.   Plaintiff's Claims and Procedural History

In the Amended Complaint, Plaintiff alleges that during the twenty years he held privileges at Moses Cone, he was subjected to discriminatory acts by Defendants, specifically by Defendant Dr. Berry in his role as Chief of the Cardiovascular Section and Chair of the Peer Review Committee ("PRC") at Moses Cone, based on unfounded accusations questioning Plaintiff's professionalism and patient care.  (Am. Compl., Doc. #22, ¶ 17.) Plaintiff alleges that he repeatedly overcame Defendants' accusations until July 2019, when Plaintiff's interventional privileges were suspended by Moses Cone's Medical Executive Committee ("MEC") and later permanently terminated by Moses Cone's Board of Trustees following an interventional procedure that Plaintiff performed on July 13, 2019.  (Am. Compl. ¶¶ 103, 105-06.)  Plaintiff alleges that the investigation and review following the July 13 procedure were orchestrated by Dr. Berry, who did not investigate white cardiologists for similar behavior but subjected the other cardiologist of Indian ethnicity, Dr. Kadakia, to unfounded investigations and similar loss of privileges.  (Am. Compl. ¶¶ 48-49, 99.)  Plaintiff alleges that the investigation procedure and the ultimate termination of his interventional cardiology privileges was unfair, tainted with racial animus, and in violation of Mose Cone's Bylaws, which Plaintiff alleges served as a contract between Moses Cone and Plaintiff.  (Am. Compl. ¶¶ 92, 96, 116.)

Following resolution of an earlier Motion to Dismiss, three claims remain and are now addressed by Defendants on summary judgment: (1) a claim for racial discrimination in violation of 42 U.S.C. § 1981 against both Defendants; (2) a claim for breach of contract and

2

violation of North Carolina General Statue § 131E-85 against Moses Cone[1]; and (3) a claim for punitive damages against both Defendants.[2]

B. <u>Facts</u>

a. <u>July 13, 2019 Procedure</u>

On July 13, 2019, one of Plaintiff's patients presented to Moses Cone's emergency room with ST elevation myocardial infarction ("STEMI"), a type of heart attack. The patient was transferred to Moses Cone's catheterization laboratory ("Cath Lab"), where Plaintiff performed a diagnostic catheterization with angiography. (Hearing Report, Doc. #137-1 at 34-35.)[3] The angiogram revealed that the patient had a spontaneous coronary artery dissection ("SCAD"), which the Parties agree that Plaintiff failed to diagnose. (Hearing Report, Doc. #137-1 at 34-35; Harwani Dep., Doc. #136-3 at 18-19; Hearing Transcript #136-4 at 5.) The patient had also experienced a SCAD in 2017, and if Plaintiff had reviewed the patient's 2017 angiograms and compared them to her 2019 angiogram, he would have recognized that her

---

[1] North Carolina General Statute § 131E-85 provides that: "The granting or denial of privileges to practice in hospitals to physicians licensed under Chapter 90 of the General Statutes, Article 1, dentists, optometrists, and podiatrists and the scope and delineation of such privileges shall be determined by the governing body of the hospital <u>on a non-discriminatory basis</u>." N.C. Gen. Stat. § 131E-85 (emphasis added). Similarly, Section 3.2(c) of the Bylaws provides that: "Staff membership or specific Clinical Privileges shall not be limited or denied <u>on the basis of sex, race, creed, or national origin</u> or on the basis of any other criterion unrelated to the delivery of good patient care at the Hospital, to professional qualifications, to the Hospital's purposes, needs and capabilities, or to the community's needs." (Bylaws, Doc. #135-4 at 20 (emphasis added).) Here, all of Plaintiff's claims are based on the allegation that the termination of his privileges was based on race discrimination.

[2] In the Amended Complaint, Plaintiff also raised a claim of Unfair and Deceptive Trade Practices in violation of North Carolina General Statute § 75-1.1 against Moses Cone, alleging that the termination of his interventional privileges was an effort to drive him out of practice and force him to sell property that Moses Cone was trying to acquire. That claim was dismissed on a Recommendation [Doc. #44] to which Plaintiff did not object.

[3] For ease of reference, cited page numbers will refer to the sequential numbers generated by the Court's Electronic Case Filing ("ECF") system.

3

2017 SCAD healed without intervention. (Hearing Report, Doc. #137-1 at 37; Harwani Dep., Doc. #136-3 at 20.)

Plaintiff elected to perform a percutaneous coronary intervention ("PCI"), an interventional procedure where a catheter is used to open a blocked artery using balloons and stents. (Procedure Report, Doc. #136-5; Glossary, Doc. #135-2 at 35.) There is significant factual dispute as to whether Plaintiff's intervention conformed with the standard of care, particularly in light of the patient's SCAD that he failed to diagnose. Dr. Berry and other interventional cardiologists at Moses Cone and Atrium Health opined that the proper course of treatment in this circumstance would have been to treat the patient conservatively using medical management without intervention, and that the risks with percutaneous intervention were too great. (External Reviews, Doc. #137 at 66-72; Case Reviews, Doc. #137 at 45-47, 58-61.) By contrast, Dr. Johnathan Marmur, one of Plaintiff's experts, testified in deposition that Plaintiff was operating "within his rights" to exercise his clinical judgment to perform the intervention in this circumstance, (Marmur Dep., Doc. #155-9 at 6), and another one of Plaintiff's experts, Dr. Samin Sharma, testified that Plaintiff's decision to perform PCI was correct whether or not Plaintiff had identified the SCAD, and that based on the patient's angiogram and clinical presentation, he (Dr. Sharma) also would have intervened (Sharma Dep., Doc. #155-10 at 4, 6, 8-9). As discussed in more detail *infra*, although there is dispute on this issue, it is ultimately not material to the determination of Plaintiff's claims.[4]

---

[4] The Court sets out the chain of events in detail below, given Plaintiff's allegations that Dr. Berry's involvement in the investigation of this incident was motivated by race discrimination and that the ultimate termination of his privileges was based on race discrimination. Ultimately, the Court concludes that Plaintiff has failed to present any evidence from which a jury could find that the termination of his privileges was caused by race discrimination, and it is not this Court's "province to decide whether the reason [for termination of Plaintiff's

4

The PCI began around 11:15 a.m., and because of the nature of the patient's condition and related complications, the procedure was long and complex. (Procedure Report, Doc. #136-5 at 17.) Dr. Berry entered the Cath Lab twice during Plaintiff's procedure: first, around 1:30 p.m., and then again around 4:00 p.m. (Berry Dep., Doc. #155-7 at 11-15, 25-27, 41.) Dr. Berry first responded to the Cath Lab after receiving a text from Nurse Gina Garrett, one of the staff technicians present in the Cath Lab. (Garrett Dep., Doc. #155-15 at 4; Texts, Doc. #136-6 at 2-3.)[5] During this visit, Dr. Berry reviewed the patient's images and asked Plaintiff if he needed any help. Plaintiff said no, and Dr. Berry left after a minute or two. (Berry Dep., Doc. #155-7 at 11, 24, 27.) Around 3:30 or 4:00 p.m., Dr. Berry received a text message from Nurse Hayley Ringley Blower, another member of the Cath Lab staff, asking Dr. Berry to "come back ASAP." (Blower Dep., Doc. #155-16 at 9; Texts, Doc. #155-21 at 4.) Dr. Berry returned to the Cath Lab, where Plaintiff was considering administering a blood-thinning medication. Dr. Berry expressed concern about using the medication because he was worried there could be a complication. (Hearing Transcript, Doc. #155-2 at 33; Berry Dep., Doc. #155-7 at 46.) Dr. Berry advised Plaintiff not to administer the drug, and Plaintiff heeded that advice. (Blower Dep., Doc. #155-16 at 23-24, 26, 28; Berry Dep., Doc. #155-7 at 46-47; Hearing Report, Doc. #137-1 at 36.)

---

privileges] was wise, fair, or even correct, ultimately, so long as it truly was the reason for the [] termination." Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000)).

[5] The texts reflect that Nurse Garrett texted Dr. Berry asking if Dr. Berry would "take a look at this Harwani case with us" after the intervention was underway and complications arose. Dr. Berry asked Nurse Garrett if Plaintiff wanted him to come. Nurse Garrett said she hadn't asked Plaintiff. Nurse Garrett then asked Plaintiff, and Nurse Garrett then texted Dr. Berry that "he said yes stop by." (Texts, Doc. #136-6 at 3.)

At some point that afternoon, Dr. Berry sent text messages to Dr. Bruce Swords, the Chief Medical Officer at Moses Cone, who acts as administrator and representative of the CEO ("CMO Swords"), and Dr. Martin Webb, the President of Medical Staff at Moses Cone ("Staff President Webb"), expressing concern about Plaintiff's procedure. (See Text Messages, Doc. #155-18; Text Messages, Doc. #155-20; Webb Dep., Doc. #155-19 at 38-39.) Dr. Berry then spoke to Staff President Webb by phone and informed him that he had observed a case that he was concerned about. (Berry Dep., Doc. #155-7 at 30-31; Webb Dep., Doc. #155-19 at 36-38.) Staff President Webb then called CMO Swords to notify him of Dr. Berry's concerns about the procedure, (Berry Dep., Doc. #155-7 at 30-31; Webb Dep., Doc. #155-19 at 37), which included concerns about the missed SCAD diagnosis, communication issues with Cath Lab staff, and the length of the procedure and the amount of radiation to which the patient was exposed (Hearing Transcript, Doc. #155-2 at 31-32). Staff President Webb and CMO Swords asked that another cardiologist review the case to verify Dr. Berry's concerns about Plaintiff. (Berry Dep., Doc. #155-7 at 31; Webb Dep., Doc. #155-19 at 42.) Dr. Hank Smith, another interventional cardiologist at Moses Cone who was on "STEMI call" at the time, reviewed the patient's films and agreed with Dr. Berry that Plaintiff should not have intervened. (Hearing Transcript, Doc. #155-2 at 31-32; Webb Dep., Doc. #155-19 at 42; Smith Dep., Doc. #155-8 at 18-19.) After receiving Dr. Smith's opinion, Dr. Berry followed up with CMO Swords and Staff President Webb and let them know that Dr. Smith agreed with his assessment of the patient's films, and that Dr. Smith agreed that "a reasonable interventionalist, including himself, wouldn't have intervened in this situation." (See Text Messages, Doc. #155-18; Text Messages, Doc. #155-20.) Based on this information, CMO

6

Swords and Staff President Webb concluded that Plaintiff's diagnostic and interventional privileges should be placed on precautionary suspension. (See Text Messages, Doc. #155-18; Text Messages, Doc. #155-20; Webb Dep., Doc. #155-19 at 41.)

Plaintiff completed the procedure at 5:10 p.m. (Procedure Report, Doc. #136-5 at 30.) Immediately after, Staff President Webb called Plaintiff to notify him that his diagnostic and interventional privileges were on precautionary suspension due to "serious clinical concern[s]" pending investigation by the Medical Executive Committee ("MEC").[6] (Harwani Dep., Doc. #155-17 at 16; Letter from Webb, Doc. #137 at 40.) Ultimately, though the patient survived the procedure, it was over six hours long, resulted in the placement of five stents, and exposed

---

[6] The MEC leads the Medical Staff at Moses Cone and includes a rotating group of over 25 physicians across specialties. As part of its responsibilities, the MEC is charged with making recommendations to the Board regarding physician privileges in cases involving corrective actions. (Bylaws, Doc. #135-4 at 64-67, 50-52.) The following is a rough outline of the relevant entities and roles, for reference:

MEC receives request for corrective action
      MEC can refer case to  →→→→→→→→→→→  Investigative Subcommittee
↓                                              (makes Report)
MEC considers Report and makes recommendation
      Challenge is referred to  →→→→→→→→→→→  Fair Hearing Committee
↓
MEC considers Fair Hearing Report and makes final recommendation
↓
↓
Board of Trustees makes decision on MEC recommendation
      Challenge is referred to  →→→→→→→→→→→  Appellate Review Committee
↓
Board of Trustees reviews Appellate Review report and makes final decision

Plaintiff's case was also referred to the Peer Review Committee ("PRC") for review. (PRC Minutes, Doc. #135-2 at 231-32.) The PRC is charged with evaluating quality of care and identifying opportunities for improvement, including identifying factors for initiating a focused review, appointing medical committees to conduct a focused review, and determining when external review may be required. (Bylaws, Doc. #135-4 at 79-80.) The PRC can send a request for corrective action to the MEC, but the MEC process can be triggered multiple ways, and here the PRC review happened separately while the MEC process was also proceeding. The PRC met on September 25, 2019 and identified several concerns with the July 13 procedure. (PRC Minutes, Doc. #135-2 at 231-32.) Although Dr. Berry was a member of the PRC, he was absent at the September 29 meeting. (PRC Minutes, Doc. #135-2 at 231.) It appears that the PRC review terminated after the case was referred from the MEC for Fair Hearing review. (Summary, Doc. #135-2 at 31.)

the patient to large quantities of contrast and radiation. (Procedure Report, Doc. #136-5 at 30-33, 38-41; Hearing Report, Doc. #137-1 at 34.)

    b. <u>Termination of Plaintiff's Interventional Privileges</u>

Two days after the procedure, on July 15, 2019, the MEC convened and formed a five-person Investigative Subcommittee to investigate Plaintiff's actions during the July 13 procedure. (MEC Minutes, Doc. #137 at 41-42.) Dr. Berry was a member of the MEC and was present at the July 15 meeting in his capacity as Representative for the Cardiovascular Section, but was not appointed as a member of the Investigative Subcommittee. (MEC Minutes, Doc. #137 at 41-42.) Dr. Berry asked seven Moses Cone cardiologists to review the films from what was described as "the SCAD case" and provide their impressions to the Investigative Subcommittee. (Pl.'s Br., Doc. #155 at 6; Berry Dep., Doc. #157-2 at 7-8; Case Reviews, Doc. #137 at 58; Hearing Transcript, Doc. #155-23 at 4-5.)

The Investigative Subcommittee was specifically charged with "review[ing] the films, chart and transcripts of what occurred that led to multiple complications and if the provider acted in accordance with the standard of care." (Subcommittee Minutes, Doc. #137 at 62.) As part of its investigation, the Investigative Subcommittee interviewed fact witnesses, including Plaintiff and the Cath Lab staff who assisted with the procedure, and considered the impressions from the seven cardiologists at Moses Cone who reviewed the patient's films. There is no evidence that Dr. Berry received or reviewed the impressions from those seven cardiologists, and there is no evidence that Dr. Berry spoke directly with any members of the Investigative Subcommittee about the case. (Berry Dep., Doc. #136 at 5-8.) All seven cardiologists asked to review the films agreed that the patient would have been best served by

medical therapy, not intervention and PCI, and that intervention had too many risks for complications, as occurred in this case, although at least one reviewer also noted that the patient's "clinical condition could significantly influence management decisions in real-time." (Case Reviews, Doc. #137 at 45-47, 58-61.) The Cath Lab staff interviews reflected that five nurses/technicians were interviewed, that they had experience at the Moses Cone Cath Lab ranging from 3 years to 25 years, and all five reported concern that Plaintiff was not receptive to staff input, unlike other physicians who recognized the value of the experience of the staff, and that staff were often frustrated by Plaintiff's failure to communicate his thinking so they could anticipate and prepare. (Interviews, Doc. #137 at 43-44, 48-54.) The Cath Lab staff members in the procedure on July 13 noted concern regarding Plaintiff's decision to intervene on such a small vessel, and concern that Plaintiff did not communicate a plan or the end goal. The Cath Lab nurses/technicians who were asked indicated that they would not want Plaintiff to do a procedure on themselves or their loved ones, and would ask for another physician. (Interviews, Doc. #137 at 43-44, 48-54.)

In his interview, Plaintiff conceded that he did not initially diagnose the patient's SCAD. (Harwani Interview, Doc. #137 at 54-55.) In addition, he acknowledged that he had trouble working with Cath Lab staff, and he mentioned that he felt the staff acted differently with him than with other cardiologists at Moses Cone, which he felt was because he is "brown" and "[has] a solo practice." (Harwani Interview, Doc. #137 at 54-55.) In this interview, Plaintiff did not mention or suggest that he felt Dr. Berry treated him differently because of his race or his solo practice.

On July 23, in advance of the Investigative Subcommittee's upcoming meeting, the members of the Investigative Subcommittee received emailed copies of the interview transcripts, and the chairman of the Investigative Subcommittee addressed Plaintiff's claims of bias, noting in an email to the Investigative Subcommittee members that in this case, "[t]here is a need for accountability, but combined with a need for cultural acceptance and avoiding double standards." (Emails, Doc. #155-26 at 2.)

The Investigative Subcommittee convened on July 24, 2019, to discuss the investigation. (Subcommittee Minutes, Doc. #137 at 62.) Because Dr. Berry was not a member of the Investigative Subcommittee, he was not present at this meeting. (Subcommittee Minutes, Doc. #137 at 62.) Committee members reviewed transcripts of the interviews, the film reviews performed by the other interventional cardiologists, and the July 13 procedure report. (Subcommittee Minutes, Doc. #137 at 62.) Following a "lengthy discussion," the "committee agreed that the major issues identified were":

- The missed diagnosis of SCAD – this is a rare occurrence but has been well known in the interventional cardiology world for the past 5 years. If films from the patient's previous catheterization had been reviewed, a comparison of the artery in question and the size of the lumen would have supported SCAD. Also recognized, were the patient[']s impressive EKG indicating a STEMI and clinical presentation that increase the tension in the environment and quick judgements.
- The lack of communication and conversation with the CV lab staff – staff lack confidence and trust based on decision-making and failure to update them on the patient's plan of care. The CV Lab culture supports collegial discussion and is essential for patient safety.
- Judgement in the management of complications, specifically pharmaceutical intervention – type and amount of drugs used in the presence of SCAD.
- The reluctance to seek assistance from another cardiologist given the complexity of the case.
- The length of time, including contrast and radiation, for this case to be completed.

10

(Subcommittee Minutes, Doc. #137 at 62.) The chairman of the Investigative Subcommittee, himself an interventional cardiologist, also wrote a memo summarizing his own review, noting that the chance of successful intervention was low, and a more conservative approach would have been the best course of action. (Memo, Doc. #155-27 at 2.)[7] The memo also noted concern regarding Plaintiff's judgment, communication with staff, and the need to ensure "fair and equal treatment compared to other providers." (Memo, Doc. #155-27 at 3.) The memo offered two potential recommendations for how to proceed:

1. Consideration of requirement of physician to scrub in at the table with 50 cases with case critiques submitted prior to restoration of privileges. This could be accomplished by provider referring interventional cases to colleagues who then interact with the provider and review referenced critiques. The performing physician colleague would be credited with the procedure for quality purposes, and also bill for the procedure.

2. Consideration of removal of privileges — this option requires consideration of [the need for fair and equal treatment compared to other providers,] the potential role of unconscious bias and group exclusion, and the potential impact of prior actions taken.

(Memo, Doc. #155-27 at 3.)

The MEC reconvened the following day, July 25, 2019. (MEC Minutes, Doc. #137 at 63-64.) At the meeting, Staff President Webb provided an overview of Plaintiff's July 13 intervention, as well as the materials collected and reviewed by the Investigative Subcommittee, including the interview transcripts and interventional cardiology film impressions. (MEC Minutes, Doc. #137 at 64.) After a "lengthy discussion," the MEC

---

[7] Thus, the Investigative Subcommittee had the film reviews from seven cardiologists (Case Reviews, Doc. #137 at 45-47, 58-61), as well as the review from the interventional cardiologist who was the chairman of the Investigative Subcommittee (Memo, Doc. #155-27 at 2-3).

identified concerns regarding Plaintiff missing the SCAD diagnosis, Plaintiff's decision to proceed with intervention, Plaintiff's judgment regarding medication choices and radiation exposure, Plaintiff's failure to call another cardiologist for assistance, and the lack of communication between Plaintiff and the Cath Lab staff. (MEC Minutes, Doc. #137 at 64.) The minutes reflect that the MEC also considered Plaintiff's assertion that there was bias with the Cath Lab team because he is in a solo, private practice and he is of a different nationality, and Plaintiff's assertion that he does not receive the level of respect he deserves. (MEC Minutes, Doc. #137 at 64.)

Based on these discussion points and "significant concerns regarding a missed diagnosis, judgment issues and the CV Lab Team dynamics with Dr. Harwani," the MEC voted unanimously to extend the temporary suspension of Plaintiff's interventional privileges due to "risk of imminent threat to patient safety," and to restore Plaintiff's diagnostic privileges, which they found did not pose the same threat to patient safety. (MEC Minutes, Doc. #137 at 64.) In addition, the MEC voted to send the case for external peer review to ensure that the MEC was being as "fair and as unbiased as possible." (MEC Minutes, Doc. #137 at 64; Webb Dep., Doc. #138-4 at 3.) Dr. Berry was present at this meeting and voted on the issue. (MEC Minutes, Doc. #137 at 63-64). Another doctor on the MEC who was present at the meeting testified in deposition that the MEC's decisions were generally "collective," and that Dr. Berry did not tell doctors on the MEC to vote a certain way or advocate for Plaintiff's privileges to be suspended. (Dep., Doc. #138-6 at 3-4.)

The external review was performed by two physicians at Atrium Health. (External Reviews, Doc. #137 at 66-72.) Dr. Berry did not have any involvement in obtaining the

12

external review from Atrium, did not provide the reviewers with information, and did not communicate with anyone at Atrium about the July 13 case. (Berry Dep., Doc. #136 at 8.) Both reviewers, who were and remain anonymous, considered the entirety of the case file without any knowledge or information regarding Plaintiff's identity or race, and each concluded that Plaintiff's intervention did not meet generally accepted performance standards during the July 13 procedure. (External Reviews, Doc. #137 at 66-72.) Specifically, both reviewers indicated that that the risks of intervention outweighed the benefits, and that they would not have intervened and would instead have managed the patient's condition through medication. (External Reviews, Doc. #137 at 68, 71.)

Following the MEC's July 25 vote to continue the temporary suspension of Plaintiff's interventional privileges, Plaintiff requested a Fair Hearing. (Notice of Hearing, Doc. #137 at 76-78.) The letter to Plaintiff notifying him of the Fair Hearing summarized the reasons for the MEC decision that was being reviewed at the Fair Hearing, to include: the missed SCAD diagnosis on July 13, the lack of communication with staff on July 13, the judgment to intervene with PCI rather than medication, the reluctance to consult with other cardiologists, and "other similar instances in the past where you have not exercised appropriate medical judgment in the course of treatment for certain patients." (Notice of Hearing, Doc. #137 at 76-78.) The letter noted that the MEC specifically considered a prior suspension of Plaintiff's privileges two years earlier, in 2017, involving concern regarding lack of communication and

judgment in treatment selection, as well as Plaintiff's "history of other prior similar instances." (Notice of Hearing, Doc. #137 at 76-78.)[8]

The Fair Hearing was conducted in October 2019, during which five physicians sat as jurors (the "Hearing Panel"). (Hearing Report, Doc. #137-1 at 27.) Dr. Berry testified in deposition that he was not involved in the Fair Hearing process in any capacity: he did not serve as the hearing officer, he was not on the Hearing Panel, and although Dr. Berry was on both Parties' lists of potential witnesses, he was not called to testify by either party and did not offer evidence at the hearing. (Berry Dep., Doc. #155-7 at 7-8; Harwani Potential Witness List, Doc. #137 at 93; MEC Potential Witness List; Doc. #137 at 96; see Ray Dep., Doc. #138-5 at 3-4.) Following the presentation during six sessions between October 14 and 29, 2019, the Hearing Panel agreed with the MEC's initial determination, but with a modified recommendation. (Hearing Report, Doc. #137-1 at 41.) Specifically, the Hearing Panel found

---

[8] With respect to Plaintiff's "history of other prior similar instances" at Moses Cone, the MEC asserted at the Fair Hearing that Plaintiff had a history of poor judgment, as reflected in other prior cases:

- Plaintiff's privileges were previously suspended by the MEC in 2017, based on an incident in 2016, when Plaintiff performed an interventional procedure rather than medical treatment, and based on an incident in 2017 when Plaintiff performed a PCI resulting in complications and raising concerns regarding medical judgment in patient selection, failing to call for assistance, and communication issues with staff. External reviews reflected that while medical therapy was reasonable or preferred, Plaintiff did not breach the standard of care, so his privileges were restored.
- In 2018, Plaintiff treated his sibling and chose not to transfer care to a colleague until directed to do so.
- In 2019, Plaintiff sought to proceed using an arterial coil for which he did not have privileges and for which staff was not trained.
- Plaintiff's cases over the years reflected increased fluoroscopy time and increased contrast levels.
- Plaintiff's "gray file" reflected a similar history, including a focused review in 2001 based on case management, a focused review in 2009-10 regarding treatment in high risk cases, and failing to consult at a colleague's request in 2009.

(MEC Summary, Doc. #137 at 103-06.) Plaintiff objected to the consideration of these prior incidents at the Fair Hearing, arguing that the initial MEC decision was based only on the July 13 incident, but that objection was overruled. Plaintiff also disputed the merits of the prior investigations and focused reviews, arguing that his judgment was found to be appropriate in each instance, and that the 2017 focused review was terminated early after only one year instead of two based on his appropriate medical judgment. The Court notes the history here since it was part of the consideration at the Fair Hearing and was therefore part of the record before the Board.

that Plaintiff's actions on July 13 were below the standard of care, that the risks of intervention were too high compared to the risks of medical therapy, that all of the MEC witnesses, including the nurses, lab technicians, and interventional cardiologists, testified that they would not refer a family member or friend to Plaintiff for interventional cardiology, that Plaintiff continued to have issues with communication and treatment of staff, that his "actions and comments do not reflect the respect for staff or the collaborative approach expected at the Hospital," that Plaintiff had been repeatedly counseled about his treatment of staff but was unwilling to change his behavior, and that Plaintiff had a history of poor medical judgment and failure to collaborate. (Hearing Report, Doc. #137-1 at 27-41.) The Hearing Panel concluded that:

> The record reflects that the Hospital has attempted multiple remedial efforts with Dr. Harwani over the years and has communicated clearly about what he must do to retain these privileges without success. Nevertheless, the panel feels that the MEC should consider reinstatement of his interventional privileges contingent upon (1) Dr. Harwani demonstrating that he has modified his clinical behavior and resolved the medical team communication issues that led to his privileges being revoked; and (2) completion of continued focused review of his medical care by his peers with feedback. The committee feels the MEC is best suited to delineate the exact criteria that would be required for the pathway to reinstatement.

(Hearing Report, Doc. #137-1 at 41.) The Hearing Panel also specifically addressed Plaintiff's complaints of bias, which they found "ha[d] no basis." (Hearing Report, Doc. #137-1 at 40-41.) In particular, the Hearing Panel noted that Plaintiff believed Moses Cone was biased against him for three reasons: because he owned a piece of property near the hospital that Moses Cone wanted to purchase but that Plaintiff did not want to sell; because he was a solo independent practitioner; and because he is "brown." (Hearing Report, Doc. #137-1 at 40-41.) With respect to Plaintiff's claims of bias based on his race, the Hearing Panel concluded

that there was "no evidence" that the MEC was pursuing the action against Plaintiff based on his race. (Hearing Report, Doc. #137-1 at 40.) The Hearing Panel noted that the medical staff allowed Plaintiff "several extensions to obtain his required board recertification and did not initiate action to revoke his privileges," that two of the seven interventional cardiologists who provided an initial review of the July 13 procedure were non U.S.-born citizens, and one of those was of Indian descent, that the MEC's expert interventional cardiologist testified at the Fair Hearing that "as a non-US born citizen he has never felt discriminated by Medical Staff or Cone Health," and that both of the co-directors of the Cath Lab were non U.S.-born citizens, and one was of Indian descent. (Hearing Report, Doc. #137-1 at 40-41.)[9]

On December 23, 2019, the MEC reconvened to discuss the Hearing Panel's recommendation that Plaintiff be offered a path to reinstatement of his interventional privileges. (MEC Minutes, Doc. #137-1 at 43-44.) At this point, Dr. Berry was no longer a member of the MEC, was not at the meeting, and had no part in the discussion or voting at the meeting. (MEC Minutes, Doc. #137-1 at 43-44.) At the meeting, the MEC specifically voted on whether Plaintiff's interventional privileges should be suspended indefinitely, or whether the MEC should follow the Hearing Panel's recommendation to consider allowing a path to reinstatement of Plaintiff's privileges following a "course of action" to modify Plaintiff's communication with Cath Lab staff and a focused review. (MEC Minutes, Doc. #137-1 at 44.) Following deliberation, the 25-member MEC unanimously passed a motion to

---

[9] The record also reflects that the MEC included yet another doctor of Indian descent, and that the 5 members of the Fair Hearing Panel included at least one doctor of Indian descent. (See Chart, Doc. #135-3 at 7-8.) Thus, the record reflects numerous doctors of Indian descent practicing at Moses Cone, including as interventional cardiologists, and multiple doctors of Indian descent participating in the process of reviewing the July 13 procedure and making the relevant determinations as to the appropriate course.

recommend permanently revoking Plaintiff's interventional privileges, modifying the prior precautionary suspension to recommend permanent revocation. (MEC Minutes, Doc. #137-1 at 44.) The MEC "acknowledge[d] the recommendation of rehabilitation and continued focused review" but chose not to adopt this recommendation "due to the complexity and difficulty of such monitoring." (MEC Minutes, Doc. #137-1 at 44.) In voting to modify the Hearing Panel's recommendation, the MEC adopted the Fair Hearing Report in full, with several additional findings, and with the following revised conclusion and recommendation to the Board of Trustees:

> The record reflects that the Hospital has attempted multiple remedial efforts with Dr. Harwani over the years and has communicated clearly about what he must do to retain these privileges without success. The MEC recommends that Dr. Harwani's interventional privileges be terminated rather than indefinitely suspended. The MEC has directed the Medical Staff Services Office to make available to Dr. Harwani upon request the results of focused review of his medical cases by his peers during the past two years to assist him with any efforts he wishes to undertake to improve his quality of care and communication in the future.

(Memo to Board, Doc. #137-1 at 45-46.)

The MEC's vote to permanently terminate Plaintiff's interventional privileges operated as a recommendation to the Board, which would ultimately vote on and decide the issue. (Memo to Board, Doc. #137-1 at 45-46; see Bylaws, Doc. #135-4 at 64-67.) Prior to meeting on the recommendation, the Board members received the Hearing Panel Report as well as the Fair Hearing Transcript and Exhibits. (Letter, Doc. #137-1 at 56-57.) On March 24, 2020, the Board convened to vote on the MEC's recommendation. The Board voted unanimously "to accept and adopt the MEC's recommendation" to permanently terminate Plaintiff's interventional privileges. (Board Minutes, Doc. #137-1 at 58-59.) Dr. Berry was not a

member of the Board, was not present at the meeting, and did not vote on the matter. (Board

Minutes, Doc. #137-1 at 58-59.)

Plaintiff was notified of the Board's decision and his right to appeal the Board's

decision to the Appellate Review Committee ("ARC"). (Memo to Dr. Harwani, Doc. #137-

1 at 60.) Plaintiff exercised this right. An ARC was subsequently appointed, which "reviewed

over 1,250 pages of documents related to the matter, including materials submitted by

[Plaintiff] and the MEC for consideration." (Board Minutes, Doc. #137-1 at 96; ARC Memo,

Doc. #137-1 at 93-94.) After this review, the ARC voted unanimously to uphold the Board's

decision permanently terminating Plaintiff's interventional privileges. (ARC Memo, Doc.

#137-1 at 93-94.) In so doing, the ARC noted:

> The Committee believes that it is the responsibility of the Board of Trustees to
> ensure safe patient care and to create and maintain a culture of non-toxic and
> collaborative teamwork. It is the Committee's opinion that Dr. Harwani's
> behavior is counter to this culture. Dr. Harwani continues to demonstrate a
> lack of self-awareness of his communication issues, poor patient selection for
> interventional cases and poor management of interventional cases, which has
> resulted in patient harm. Dr. Harwani has been provided appropriate due
> process and deep and extensive deliberation has occurred and every opportunity
> has been given to this present case. The Committee believes that the capacity
> of the MEC to provide further oversight of Dr. Harwani's interventional
> procedures is neither reasonable nor practical.

(ARC Memo, Doc. #137-1 at 94.) Dr. Berry was not a member of the ARC, and did not vote

on this issue or participate in this process. (ARC Memo, Doc. #137-1 at 93-94.)

On June 23, 2020, the Board reconvened. (Board Minutes, Doc. #137-1 at 95-96.)

After reviewing the ARC's Report, which recommended the permanent termination of

Plaintiff's interventional privileges, the Board voted unanimously to adopt the ARC's

18

recommendation. (Board Minutes, Doc. #137-1 at 95-96.) With this vote, the termination of Plaintiff's interventional privileges became final. (Board Minutes, Doc. #137-1 at 95-96.)

Based on this record, Defendants now move for summary judgment, contending that there is no evidence of racial discrimination and that the evidence establishes that Plaintiff's interventional privileges were terminated for non-discriminatory reasons.

II.    STANDARD

Summary judgment is appropriate when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in a light most favorable to the non-moving party. Id. The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick Cnty. Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 477 U.S. at 247-48). A mere scintilla of evidence supporting the non-moving party's case is insufficient to defeat a motion for summary judgment. See, e.g., Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994); see also Anderson, 477 U.S. at 248 (noting that a non-moving party may not rest upon mere allegations or denials). Thus, "plaintiffs need to present more than their own

unsupported speculation and conclusory allegations to survive" a motion for summary judgment. Robinson v. Priority Auto. Huntersville, Inc., 70 F.4th 776, 780 (4th Cir. 2023).

III. DISCUSSION

A. Plaintiff's Racial Discrimination Claim Under 42 U.S.C. § 1981 Against Dr. Berry and Moses Cone

Plaintiff's first claim alleges that Defendants violated 42 U.S.C. § 1981 by terminating his interventional privileges based on his race and Indian ethnicity. (Am. Compl. ¶¶ 115-18.) Defendants argue for dismissal on the grounds that Plaintiff has not produced direct or indirect evidence of discrimination and cannot satisfy the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), and that Plaintiff has not shown that race discrimination was the but-for cause of the termination of Plaintiff's privileges.

Section 1981 provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens," which includes the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a)-(b); see Nadendla v. WakeMed, 24 F.4th 299, 305 (4th Cir. 2022) (noting that Congress passed § 1981 to "guarantee[ ] to all persons in the United States 'the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens" (citation omitted)). To prevail on a § 1981 claim, "'plaintiff must ultimately establish both that the defendant intended to discriminate on the basis of race, and that the discrimination interfered with a contractual interest.'" Nadendla, 24

F.4th at 305 (quoting <u>Denny v. Elizabeth Arden Salons, Inc.</u>, 456 F.3d 427, 434 (4th Cir. 2006)).[10]

A plaintiff can proceed on such a claim by presenting direct or circumstantial evidence that the action was motivated by intentional racial discrimination; if a plaintiff does not present sufficient direct or circumstantial evidence of race-based discrimination, a plaintiff can instead attempt to establish a claim using the <u>McDonnell-Douglas</u> burden-shifting framework. <u>See</u> <u>Guessous v. Fairview Prop. Invs.</u>, 828 F.3d 208, 216-17 (4th Cir. 2016). Here, Plaintiff has not presented any direct or circumstantial evidence of racial discrimination, and Plaintiff conceded in his deposition that not a single member of the medical staff or Board behaved in a discriminatory manner towards him, said anything racially discriminatory to him, or otherwise treated him with disrespect on the basis of race. (Harwani Dep., Doc. #136-3 at 35-37, 41-46, 49, 51-52, 55-63.)

The Court notes that in his Amended Complaint, Plaintiff alleged circumstantial evidence of discrimination based on allegations that other doctors of Indian ethnicity were similarly targeted and that another doctor of Indian ethnicity, Dr. Kadakia, was similarly investigated and stripped of privileges. (Am. Compl. ¶ 49, ¶ 122.) However, Plaintiff has not presented any evidence regarding Dr. Kadakia or any other alleged mistreatment of doctors of Indian ethnicity. Instead, the record reflects that many doctors of Indian descent were

---

[10] Plaintiff alleges that Moses Cone's Bylaws create a contractual interest between Plaintiff and Moses Cone, and that Defendants violated § 1981 when they interfered with this interest by terminating or causing the termination of his privileges based on Plaintiff's race. (Am. Compl. ¶ 116.) Under North Carolina law, a hospital's offer of privileges, if accepted by a physician, may be a contract that incorporates the terms of the hospital's bylaws. <u>Virmani v. Presbyterian Health Servs. Corp.</u>, 127 N.C. App. 71, 76-77 (1997). Defendants "assume" but "do not concede" that the Bylaws serve as a contractual interest between Plaintiff and Moses Cone.

practicing at Moses Cone, including as interventional cardiologists and as co-director of the Cath Lab, and doctors of Indian descent were involved in the film review of Plaintiff's June 13 procedure, and were involved as members of the MEC, and as part of the Fair Hearing Panel. Plaintiff has not presented any evidence that any of these other doctors of Indian descent, including those in the cardiology department, were targeted or discriminated against in any way.

The Court also notes that in the Amended Complaint, and as part of the briefing on the Motion to Dismiss, Plaintiff alleged that Dr. Berry acted with racially discriminatory motive and drove the decision-making that led to the termination of Plaintiff's privileges. However, Plaintiff has not presented any evidence of discriminatory animus or race-based action by Dr. Berry, and Plaintiff concedes that Dr. Berry did not make any racially discriminatory statements or otherwise say anything to him that was discriminatory. (Harwani, Dep., Doc. #136-3 at 57.) By Plaintiff's own accounting, the only basis for alleging racial bias by Dr. Berry is Plaintiff's own belief that his cases had been wrongfully reviewed and wrongfully portrayed. (See Harwani Dep., Doc. #136-3 at 7-9.)[11]

Plaintiff also has not presented evidence that Dr. Berry controlled the ultimate termination of his interventional privileges. It is undisputed that Dr. Berry was not part of the Fair Hearing Panel, was not even present for the Fair Hearing, was not part of the 2019 MEC that recommended permanent suspension of Plaintiff's interventional privileges, and was not

_____

[11] Indeed, Plaintiff concedes that it was actually Dr. Berry who wrote an October 2018 letter stating that Plaintiff no longer needed to be on focused review because Plaintiff's 45 cases that had been reviewed in 2018 were within accepted standard practice guidelines, and Plaintiff agrees that this was not discriminatory. (Harwani, Dep., Doc. #136-3 at 7-9.) The record also reflects that while Plaintiff made allegations of bias during the Fair Hearing process, he never identified Dr. Berry as being an individual who was biased or discriminatory.

22

part of the ARC or the Board responsible for the final decision.  In his deposition, Plaintiff conceded that he does not have any information that Dr. Berry tried to do anything to influence any of the committees, other than Dr. Berry expressing his medical opinion in presenting the July 13 case.  (Harwani Dep., Doc. #136-3 at 58-59.)  Dr. Harraway-Smith, Moses Cone's 30(b)(6) designee, testified in deposition that a single physician does not have the power to take away someone's privileges, and that even when a doctor identifies a concern with another physician, it "does not mean it's going to be accepted" because "it's not a one-man show."  (Harraway-Smith Dep., Doc. #155-6 at 42-43.)  Plaintiff has presented no evidence that the decision-making by the MEC, Investigative Subcommittee, Hearing Panel, Board, or ARC indicates that their "collective position on the matter" of Plaintiff's privileges "was linked to racial animus."  See BNT Ad Agency, LLC v. City of Greensboro, 837 F. App'x 962, 975 (4th Cir. 2020).

Thus, given that Plaintiff has not relied on any direct or circumstantial evidence of race-based discrimination, the Court proceeds to the three-step burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).[12]

---

[12] Both Parties apply the McDonnell Douglas burden shifting framework in their analysis.  (Pl's Br. at 18; Defs.' Br. at 16-23.)  While the McDonnell Douglas framework was developed for Title VII discrimination cases, the Supreme Court and Fourth Circuit have since applied the test in cases arising under § 1981.  Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989); Love-Lane v. Martin, 355 F.3d 766, 786 (4th Cir. 2004).  The Fourth Circuit has reaffirmed the use of the McDonnell Doulgas analysis on summary judgment in § 1981 actions.  See Gary v. Facebook, Inc., 822 F. App'x 175, 179-80 (4th Cir. 2020) (applying McDonell Douglas analysis in § 1981 failure-to-promote action).  Specifically, the Fourth Circuit stated:

> We note at the outset that our application of McDonnell Douglas here is consistent with the Supreme Court's recent decision in Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, — U.S. —, 140 S. Ct. 1009, 206 L.Ed.2d 356 (2020).  There, the Court held that a § 1981 plaintiff must prove that race was a but-for cause of the plaintiff's injury and, by the same token, rejected the plaintiff's counterargument that McDonnell Douglas established a contrary "motivating factor" causation test.  See id. at 1019.  "Whether or not McDonnell Douglas has some useful role to play in § 1981 cases," the Court declared, "it does not mention

23

Under this burden shifting framework, the "plaintiff must first establish a prima facie case of employment discrimination." Guessous, 828 F.3d at 216-17. If the plaintiff satisfies this burden and establishes a prima facie case, "the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action." Id. Finally, if the employer satisfies their burden, "the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory." Id.

Ultimately, a plaintiff "must prove that race was the 'but for' cause" behind the decision. Wethje v. CACI-ISS, Inc., No. 8:18-cv-02424, 2021 WL 718939, at *5 (D. Md. Feb. 24, 2021) (citing Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 589 U.S. 327, 331-32 (2020)); see also Nadendla, 24 F.4th at 305. That is, the plaintiff must show "that, but for race, [he] would not have suffered the loss of a legally protected right" under the statute. Comcast, 589 U.S. at 341; see also Ali v. BC Architects Eng'rs, PLC, 832 F. App'x 167, 171 (4th Cir. 2020). "But for" causation "is established whenever a particular outcome would not have happened 'but for' the purported cause." Bostock v. Clayton Cnty., 590 U.S. 644, 656 (2020). Thus, it is "not enough" for the plaintiff "to show that "race played 'some role' in the defendant's decision-making context." Jones v. Lowe's Cos., Inc., 845 F. App'x 205, 215 (4th

---

the motivating factor test" or "address causation standards." Id. Rather, the Court characterized its decision in McDonnell Douglas as "a tool for assessing claims, typically at summary judgment, when the plaintiff relies on indirect proof discrimination." Id. We find ourselves confronting such a claim here and, as such, continue to apply McDonnell Douglas.

Id. at 180; Wethje v. CACI-ISS, Inc., No. 8:18-cv-02424, 2021 WL 718939, at *5 (D. Md. Feb. 24, 2021) ("In line with the reasoning of Comcast, the Fourth Circuit has continued to apply the McDonnell Douglas framework as a tool for assessing claims, typically at summary judgment, when the plaintiff relies on indirect proof of discrimination.") (quotations and citations omitted)). The Court thus proceeds with its analysis under the McDonnell Douglas test.

Cir. 2021) (quotation omitted). Rather, the plaintiff must show that "racial considerations *caused* the adverse decision." Id. (noting that the Supreme Court in Comcast required courts to ask "what would have happened if the plaintiff had been white?").

       i.      <u>Plaintiff Has Not Established a Prima Facie Case of Race Discrimination</u>

Beginning with the first step of the <u>McDonnell-Douglas</u> framework, to establish a prima facie case of discrimination, Plaintiff must show that (1) he is a member of a protected class, (2) his job performance was satisfactory, (3) he suffered an adverse action, and (4) he was treated differently than similarly-situated employees outside the protected class. <u>Love-Lane v. Martin</u>, 355 F.3d 766, 787 (4th Cir. 2004); <u>Dove v. United Parcel Serv. Inc.</u>, 912 F. Supp. 2d 353, 360 (M.D.N.C. 2012). Plaintiff has not met this burden.

Here, Defendants do not dispute elements one and three, membership in a protected class and adverse action, but argue that Plaintiff has not established element two, satisfactory job performance, and element four, different treatment between similarly situated employees from outside the protected class. (<u>See</u> Defs.' Br., Doc. #135, at 18-21.) Plaintiff argues that he has established all four elements.[13] (Pl.'s Br., Doc. #155, at 18-20.)

---

[13] The specific elements of the prima facie case can be adapted as appropriate for the specific factual scenario. <u>See Guessous</u>, 828 F.3d at 219. As noted by the Fourth Circuit,

    In the employee discipline context, a prima facie case consists of the following factors:
        (1) The employee is a member of the protected class;
        (2) The employer took an adverse employment action against the employee; and
        (3) The employee engaged in prohibited conduct similar to that of a person outside the protected class and was subject to more severe disciplinary measures than those enforced against the other person.

<u>Tshibaka v. Sernulka</u>, 673 F. App'x 272 (4th Cir. 2016). In the present case, Plaintiff contends that he was meeting expectations, so the Court considers that aspect of the prima facie case. However, to the extent the case involves a disciplinary procedure, the issue is whether he was subject to more severe discipline than a similarly-situated comparator, so the Court considers that aspect of the prima facie case as well.

There is no dispute that Plaintiff is of Indian ethnicity and identifies as "brown," and that his interventional privileges were permanently terminated by the Board in June 2020.  See Tshibaka v. Sernulka, 673 F. App'x 272, 279 (4th Cir. 2016) (finding that termination of hospital privileges "certainly qualifies as an adverse employment action").  The only questions before the Court at the prima facie stage are whether Plaintiff was performing his job satisfactorily at the time his privileges were terminated, and whether he was treated differently than similarly-situated employees outside the protected class.

a.  Plaintiff Has Not Established Satisfactory Job Performance

Defendants argue that over twenty years of "quality and patient safety concerns before and at the time of the July 13, 2019 case" demonstrate that Plaintiff was not satisfactorily performing his job. (Defs.' Br. at 19.)  In response, Plaintiff contends that he was performing satisfactorily leading up to the July 13, 2019 procedure and that disputes of fact with respect to whether the procedure was within the standard of care preclude summary judgment.  (Pl.'s Br. at 18-19.)  "To create a triable issue of fact as to satisfactory job performance, a plaintiff must demonstrate that he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action."  Giles v. Nat'l R.R. Passenger Corp., 59 F.4th 696, 704 (4th Cir. 2023) (quotation and internal brackets omitted).  In considering whether the plaintiff met his employer's legitimate expectations, "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff."

Id. (quotation and internal brackets omitted); see also Irani v. Palmetto Health, 767 F. App'x 399, 419 (4th Cir. 2019).

Here, Plaintiff has not shown that he was performing to Moses Cone's satisfaction at the time his interventional privileges were terminated. It is undisputed that Plaintiff missed the SCAD diagnosis and that he chose to intervene, and that multiple Moses Cone and Atrium cardiologists opined that they would not have intervened and would have instead used more conservative medical treatment. As noted above, Plaintiff presents a factual dispute regarding whether or not his treatment was within the standard of care. However, this case is not an administrative appeal or a review of the soundness of that determination. Instead, the issue is whether Moses Cone believed that Plaintiff's treatment and conduct met legitimate expectations. See Irani, 767 F. App'x at 419 ("Appellant presented expert testimony to demonstrate that his performance was within the standard of care for a second year resident -- but that is not the question. Rather, the question of import here is whether Appellant's employer believed Appellant's performance was sufficient. That is to say, whether an employee is satisfying his employer's legitimate expectations does not depend on the retrospective analysis of an expert witness or the employee's own perception, but instead depends on the perception of the decision maker. Accordingly, Appellant cannot create a genuine issue of material fact merely by arguing that his performance was sufficient." (internal quotation and citation omitted)); Vakharia v. Swedish Covenant Hosp., 190 F.3d 799, 809 (7th Cir. 1999) ("We have previously recognized that we [do] not sit as a super-personnel department that reexamines an entity's business decisions. Vakharia cannot prevail if SCH honestly believed in the nondiscriminatory reason[] it offered, even if the reason[][is] foolish

27

or trivial or even baseless. The bottom line: Vakharia has failed to show that SCH's explanation for the suspension of her privileges—that the quality of her care was substandard—was less than honest. Specifically, she has failed to raise a genuine issue that the committee was not acting in good faith reliance on the ASA report." (internal citations and quotations omitted)); Ray v. Pinnacle Health Hosps., Inc., 416 F. App'x 157, 165 (3rd Cir. 2010) ("It is not enough for Ray to show that there was a difference of professional opinion between Holman and the decision makers or that Pinnacle's decision making may have been wrong or mistaken. The plaintiff must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." (internal citation and quotation omitted)).[14]

The five review bodies at Moses Cone tasked with investigating Plaintiff's actions on July 13—the MEC, the Investigative Subcommittee, the Fair Hearing Panel, the Board, and the ARC—all found that Plaintiff's actions on July 13, including his failure to diagnose the patient's SCAD, his decision to intervene, the prolonged procedure, and the communication issues with Cath Lab staff, indicate that Plaintiff's actions on July 13 fell below Moses Cone's expectations for their interventional cardiologists and posed serious concerns for patient safety and quality of care. (MEC Minutes, Doc. #137 at 41-42; Subcommittee Minutes, Doc. #137 at 62; Hearing Report, Doc. #137-1 at 27-41; MEC Minutes, Doc. #137-1 at 43-44; Board Minutes, Doc. #137-1 at 58-59; ARC Memo, Doc. #137-1 at 93-94; Board Minutes, Doc.

_____

[14] This analysis often overlaps with the analysis at the third step of the burden shifting framework, that is, whether the non-discriminatory reason offered by defendants was a pretext for discrimination. However, because the Parties address this issue as part of the prima facie case regarding whether Plaintiff was meeting expectations, the Court considers it here. The conclusion is the same in any event.

#137-1 at 95-96.) Any disagreement regarding whether Plaintiff's actions on July 13 actually violated the standard of care is not the issue in this case and is therefore not material, as there is no dispute that Moses Cone's multiple reviewers and review panels all concluded that Plaintiff's conduct posed concerns for patient safety and quality of care, and there is no evidence that this was not the reason for the ultimate termination of Plaintiff's interventional privileges.

The evidence also reflects that the concerns related to Plaintiff's actions on July 13 were not anomalous. Rather, Defendants produced evidence reflecting care concerns spanning most of Plaintiff's tenure as an interventional cardiologist at Moses Cone that was presented to, and relied upon by, the Fair Hearing Panel, the MEC in December 2019, the Board, and the ARC in terminating Plaintiff's privileges.[15] Specifically, the Hearing Panel found that Plaintiff's hospital file

> reflects a pattern of concerns with his work dating back to 1998, including concerns about his medical judgment, his failure to consult medical colleagues and his communication problems with the cardiology staff. Several events warranted his being placed on focused review on several occasions prior to the incident in 2019 that resulted in the current Suspension.

---

[15] Plaintiff argues that the Court should ignore this "inadmissible" and "unauthenticated" evidence that the hearing officer improperly considered at the Fair Hearing. (Pl.'s Br. at 2.) To the extent Plaintiff is challenging the failure to apply the Federal Rules of Evidence at the Fair Hearing, Moses Cone's Bylaws explicitly provide that the Federal Rules of Evidence do not apply during Fair Hearing proceedings. (Bylaws, Doc. #135-4 at 109-110.) Even more importantly, the issue before this Court is not the process or procedure used at the Fair Hearing, and certainly employers may take a multitude of matters into consideration in taking an adverse action, as long as the basis for the action is not racial discrimination. The Court therefore considers all of the information before the decisionmaker in this case.

In addition, the Court notes that Plaintiff alleged in his Amended Complaint that Dr. Berry made unfounded accusations against Plaintiff for years prior to July 13, 2019, questioning Plaintiff's professionalism and patient care. (Am. Compl. ¶ 17.) However, Plaintiff agreed in deposition that he had been placed on focused review across the years, and while he argued that it was "wrongful[]," he also conceded that there are objective criteria established that triggered the peer review scrutiny, such as the amount of time a procedure took, complication rates, and fluoroscopy exposure. (Harwani Dep., Doc. #155-17 at 10-11.)

29

(Hearing Report, Doc. #137-1 at 29.) The Hearing Report additionally noted that Plaintiff was placed on focused reviews in 2001, 2009-2010, and 2017 that were initiated, in part, due to communication concerns and poor medical judgment, which were also concerns present during the July 13 procedure. (Hearing Report, Doc. #137-1 at 29-34.) Further, the Hearing Report reflects that Plaintiff's privileges were suspended in 2017 following two interventional procedures in late 2016 and early 2017 where, as here, the MEC concluded that Plaintiff should have first tried medical therapy. (Hearing Report, Doc. #137-1 at 31-32.) Plaintiff disputes the need for focused reviews and disputes the MEC's conclusion in the 2017 proceeding, and contends that his conduct was ultimately determined to be within the standard of care and his privileges were restored. However, even if Plaintiff disagreed with the prior concerns and the earlier 2017 suspension, the record here reflects that Moses Cone, through its various committees and ultimately acting through the Board, relied on a history of quality and care concerns that doctors and staff at Moses Cone felt posed a threat to patient safety and that did not significantly improve during Plaintiff's twenty-year tenure at Moses Cone despite numerous opportunities for remediation. See Irani, 767 F. App'x at 419-20 ("The record amply demonstrates that nurses, doctors, and faculty members had concerns about Appellant's compassion and empathy toward patients, his attention to detail, and his failure to document interactions with and examinations of patients. Appellant views these errors as simple mistakes that could have been corrected, but Appellees clearly viewed Appellant's errors as a continuous pattern that did not improve over several months of remediation and that put patients at risk.").

To support claims that he was performing satisfactorily leading up to July 13, Plaintiff relies on a letter that Dr. Berry wrote to Plaintiff in October 2018 following a focused review of 45 of Plaintiff's cardiology cases. (Pl.'s Br. at 18; Ltr. to Dr. Harwani, Doc. #135-2 at 170.) In the letter, Dr. Berry noted that the 45 cases were "within accepted standard practice guidelines," and that Plaintiff had "positive patient outcomes" and "respectful collegial communications and interactions." (Ltr. to Dr. Harwani, Doc. #135-2 at 170.) However, Plaintiff presented this letter, along with his evidence related to the July 13 event, during the review process, but the MEC, the Hearing Panel, the ARC, and the Board still concluded that Plaintiff was not meeting Moses Cone's expectations, considering his actions on July 13 and his history of prior concerns. The fact that there were no issues during a one-year period involving 45 cases does not preclude new concerns regarding the July 13 conduct and consideration of prior concerns for further context. See, e.g., Jones v. Calvert Grp., Ltd., No. DKC 06-2892, 2010 WL 5055790, at *7 (D. Md. Dec. 3, 2010) ("[T]he fact that Plaintiff at one time performed her job well . . . does not refute the wealth of evidence presented by Defendant to demonstrate her under-performance."), aff'd, 440 F. App'x 220 (4th Cir. 2011) (per curiam).

In addition to concerns regarding medical judgment, the record reflects that Moses Cone was also concerned regarding Plaintiff's communication with and treatment of the Cath Lab staff. As noted by the Hearing Panel, "Dr. Harwani's actions and comments do not reflect the respect for staff or the collaborative approach expected at the Hospital." (Hearing Report, Doc. #137-1 at 37.) The Hearing Panel cited Plaintiff's own testimony and the way he described the Cath Lab staff and their work (for example, describing a nurse's attitude as

31

"totally unacceptable," and criticizing a nurse's reporting of the amount of contrast used because "there is no reason to report these stupid things"). (Hearing Report, Doc. #137-1 at 37.) The Hearing Panel also cited to an earlier incident where a nurse raised questions regarding a medication ordered by Plaintiff and requested a supervisor to confirm and administer the larger dose, and Plaintiff's complaint that the nurse "felt like she could question a doctor without consequence." (Hearing Report, Doc. #137-1 at 38.)[16] Plaintiff, and his expert, take the position that the nurse should have been disciplined for failing to follow Plaintiff's orders, and Plaintiff contends that there were no communication issues on Plaintiff's part and instead it was a problem with staff. (Harwani Dep., Doc. #136-3 at 48; Plaintiff's Summary, Doc. #137-1 at 8-9.) However, the Hearing Panel concluded that Plaintiff's actions, and his testimony before the Hearing Panel, did not meet Moses Cone's expectations for respect toward and collaboration with staff. The Hearing Panel noted that issues with staff communication had been an issue for Plaintiff regardless of the specific staff members involved, beginning as early as 1998, and that Plaintiff had been counseled about his communication style but that Plaintiff was unwilling to change his behavior because he did

---

[16] During this incident in June 2019, a few weeks before the July 13 procedure, Plaintiff ordered Cath Lab staff to administer a dosage of blood thinner, and staff raised concerns because they had not administered the drug at that dose and because the medication pump gave a safety alert. Later in the same procedure, Plaintiff ordered a dose of another, different blood thinner, and staff raised concerns that it was against their training to administer both together and that the medication pump had provided another safety alert, although that alert only applied in other situations. The Cath Lab staff said they were not comfortable administering the medication as requested, and Plaintiff interpreted their concerns as refusing to provide the medications as ordered. On both occasions, a supervisor came in and administered the medication. After the procedure, Cath Lab staff raised concerns to their supervisor, stating that when they said they were not comfortable administering the medications, Plaintiff had raised his voice and told them to administer the medication. Plaintiff filed an internal complaint against one of the nurses. Plaintiff took the position that the staff did not have the right to refuse, and that if a "physician says to do it, it should be done." However, Moses Cone took the position that "the staff have a say in questioning and clarifying orders if safety is called into question." Plaintiff "did apologize if they thought he was yelling." (Memo, Doc. #135-2 at 185-87.)

not believe he was doing anything wrong. Again, Plaintiff may dispute whether the staff's actions were appropriate, and the role of the staff, and whether doctors should have greater authority over staff, but those disputes are not material here, since Moses Cone can set the standard for "the collaborative approach expected at the Hospital," and multiple review panels concluded that Plaintiff was failing to meet Moses Cone's expectations regarding that standard.

Ultimately, "the question of import here is whether [Moses Cone] believed [Plaintiff's] performance was sufficient." Irani, 767 F. App'x at 419. Conclusions reached by multiple review committees, including the MEC, the Investigatory Subcommittee, the Fair Hearing Panel, the Board, all reflect that Plaintiff's actions fell below Moses Cone's expectations. Regardless of Plaintiff's own view of his conduct, or whether or not it fell within the medically accepted standard of care, it is clear that Plaintiff was not meeting Moses Cone's expectations, and Plaintiff's disagreement with that assessment does not create an issue of material fact that must be reserved for the jury to decide.

Based on the foregoing, Plaintiff has not met his burden in establishing that he was meeting Moses Cone's legitimate expectations at the time his privileges were terminated.

b. <u>Plaintiff Has Not Established That He Was Treated Differently from Similarly Situated Employees Outside the Protected Class</u>

With respect to the fourth element, whether Plaintiff was treated differently than similarly situated employees outside the protected class, Plaintiff contends that Moses Cone treated white interventional cardiologists at Moses Cone differently than Plaintiff in the same or similar circumstances. (Pl.'s Br. at 14-15.) Specifically, Plaintiff contends that three white cardiologists, Drs. Stuckey, Berry, and Cooper, "performed PCI on SCAD patients with no repercussions." (Pl.'s Br. at 15.) Plaintiff also identifies two other cases involving white

cardiologists where the patient suffered an adverse outcome, not involving PCI on a SCAD lesion, where Plaintiff contends that the white cardiologists received less severe penalties than Plaintiff. (Pl.'s Br. at 14.) Defendants argue that none of Plaintiff's proposed comparators are valid, and that Plaintiff failed to establish that he was treated differently than his similarly situated white counterparts. (Defs.' Br. at 19-21.) As explained below, the Court agrees that Plaintiff has not presented evidence that he was treated differently than similarly situated white interventional cardiologists at Moses Cone.

"The similarly situated element requires a plaintiff 'to provide evidence that the proposed comparators are not just similar in *some* respects, but 'similarly-situated *in all respects*.'" Cosby v. South Carolina Prob., Parole & Pardon Servs., 93 F.4th 707, 714 (4th Cir. 2024) (quoting Spencer v. Va. State. Univ., 919 F.3d 199, 207-08 (4th Cir. 2019)). Thus, "to establish a valid comparator, the plaintiff must produce evidence that the plaintiff and comparator dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Haynes v. Waste Connections, Inc., 922 F.3d 219, 223-24 (4th Cir. 2019) (quotation omitted); Tshibaka, 673 F. App'x at 279 ("It is axiomatic that '[t]he similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful.'" (quoting Lightner v. City of Wilmington, 545 F.3d 260, 265 (4th Cir. 2008)); Holtz v. Jefferson Smurfit Corp., 408 F. Supp. 2d 193, 206-07 (M.D.N.C. 2006) ("[T]he employee must generally show the same decisionmaker made the disparate employment decisions." (citing Harvey v. Anheuser-Busch,

Inc., 38 F.3d 968, 972 (8th Cir. 1994) ("When different decision-makers are involved, two decisions are rarely 'similarly situated in all relevant respects.'")).

Turning first to the cases involving PCI on a SCAD patient, Plaintiff identifies two cases involving Drs. Stuckey, Berry, and Cooper that he contends make these three white cardiologists valid comparators: (1) a procedure in 2007 or 2008 by Dr. Stuckey where he intervened with PCI on a SCAD lesion (Stuckey Dep., Doc. #155-5 at 33-37); and (2) a procedure in December 2014 where Drs. Berry and Cooper consulted and agreed that Dr. Berry should intervene using PCI on a SCAD lesion (Medical Records, Doc. #127-5). (Pl.'s Br. at 15.) However, these incidents are not relevant comparators for several reasons. First, the record reflects that intervention may sometimes be appropriate in a SCAD case, but in Plaintiff's July 13 case the cardiologists at Moses Cone and on external review at Atrium concluded that the risks were too great and medication was preferable. The fact that Dr. Stuckey, Dr. Berry, and Dr. Cooper had separate SCAD cases that did call for intervention does not provide any helpful indication that they were similarly situated. Second, it is undisputed that Dr. Stuckey, Dr. Berry, and Dr. Cooper identified the patient's SCAD in their cases and then exercised medical judgment in determining whether intervention was appropriate. (Stuckey Dep., Doc. #155-5 at 33-34; Medical Records, Doc. #127-5 at 6.) In contrast, Plaintiff failed to properly diagnose his patient with SCAD and, as a result, never engaged in the same medical decision-making to determine whether, in light of the patient's SCAD, PCI was the proper treatment. Indeed, during the Fair Hearing, the Hearing Panel heard evidence regarding the various case-by-case factors that would be part of the determination in considering whether intervention would be proper, and the Hearing Panel

considered the case-specific testimony in making its determination. (Hearing Report, Doc. #137-1 at 35-36.) Third, in Dr. Stuckey's case and Drs. Cooper's and Berry's joint case, all three cardiologists consulted with other interventional cardiologists in determining whether intervention was appropriate in the circumstances. By contrast, Plaintiff independently made the decision to intervene on July 13, and his failure to seek assistance from other cardiologists was identified as one of the care concerns by the Investigative Subcommittee, the MEC, and the Hearing Panel. (Subcommittee Minutes, Doc. #137 at 62; MEC Minutes, Doc. #137 at 64; Hearing Report, Doc. #137-1 at 40.)[17] Thus, Plaintiff has not shown that these are relevant comparators or that these white cardiologists are similarly situated to Plaintiff "*in all respects.*" See Cosby, 93 F.4th at 714; Haynes, 922 F.3d at 223-24 (emphasis in original).[18]

Plaintiff also suggests that two wholly unrelated cases, neither of which appear to involve a patient with SCAD, resulted in adverse patient outcomes and are valid comparators. (Pl.'s Br. at 19-20.) For several reasons, neither are. First, Plaintiff identifies a case where a white cardiologist was sued for medical malpractice following his decision to administer an anticoagulant during a procedure in 2021. (Dep., Doc. #157-9 at 9-10.) Plaintiff contends

---

[17] Plaintiff also makes repeated reference to a class that Dr. Stuckey taught in 2016 where he presented his 2007-2008 case involving the use of PCI on a SCAD patient. (Pl.'s Br. at 15.) However, it is not clear how that presentation would impact the use of Dr. Stuckey as a valid comparator.

[18] Plaintiff also points to evidence that Dr. Berry himself had missed a SCAD diagnosis, based on the deposition testimony of Dr. Stuckey, although Dr. Stuckey explained that in that case, there was nothing on the angiogram to indicate SCAD, unlike Plaintiff's July 13 case, and that once the SCAD was evident in later imaging, no further interventions were undertaken. (Stuckey Dep., Doc. #155-5 at 4-9.) Plaintiff also argues that Moses Cone acknowledged that other cardiologists had missed a SCAD diagnosis, based on the notation in the initial MEC minutes, which acknowledged that "Dr. Harwani is not the only interventional cardiologist to miss this type of diagnosis." (MEC Minutes, Doc. #137 at 64.) However, that same record reflects that Plaintiff did not lose his interventional privileges solely as a result of a single missed SCAD diagnosis, but rather as a result of the missed diagnosis in context and in addition to the other concerns noted in the MEC minutes and as set out in further detail in the Fair Hearing report. There is no evidence of any white cardiologist with those concerns.

36

that "Dr. Berry did not investigate or punish" the white cardiologist, even though Plaintiff's decision to administer an anticoagulant during the July 13 procedure was "part of the reason [Dr. Berry] persecuted Plaintiff for the July 13 procedure." (Pl.'s Br. at 14.) As noted above, Plaintiff does not contend that this case also involved a missed SCAD diagnosis or an intervention on a patient with SCAD, and the only similarity between Plaintiff's case and the white cardiologist's case appears to be the contemplated use of an anticoagulant during an interventional procedure. This one similarity is not enough to establish that Plaintiff and the white cardiologist were "engaged in the same conduct" but were disciplined in different ways. See Haynes, 922 F.3d at 223-24. In addition, the evidence reflects that medical malpractice cases are handled through the recredentialing process, not through peer review, and the white cardiologist's case would have been considered by different reviewing bodies than those that considered Plaintiff's case, including the Credentials Committee. (Berry Dep., Doc. #157-2 at 4-6; see Bylaws, Doc. #135-4 at 71.) This too distinguishes the case such that it is not a valid comparator. See, e.g., Holtz, 408 F. Supp. 2d at 206-07.

Plaintiff also identifies another white cardiologist as a potential comparator based on an interventional procedure the white cardiologist performed in October 2018 that resulted in the death of a patient. Immediately following the procedure, the MEC unanimously voted to temporarily suspend the white cardiologist's interventional privileges, which were reinstated several weeks later in November 2018 after a MEC investigation concluded there was "no breach in the provider's ability to perform the procedures he was previously privileged to perform." (Dep., Doc. #157-7 at 4.) However, the white cardiologist's case did not involve a patient with SCAD and a decision to intervene with PCI. Although Plaintiff contends that

the case is a relevant comparator because the "patient died in part due to failures in his communications with staff," and a "jury can compare the MEC's treatment of this White doctor whose communication failures caused his patient to die to what the MEC did to plaintiff for much less severe issues and conclude that Dr. Berry went easy on the White doctor compared to how he treated Plaintiff," (Pl.'s Br. at 14), the fact that both procedures involved communication failures is not enough to make the case relevant as a comparator. The MEC identified multiple issues related to Plaintiff's performance during the procedure, including Plaintiff's misdiagnosis of SCAD, judgment in the management of complications, reluctance to seek assistance from another cardiologists in light of the complexity of the case, and the length of the procedure, including the patient's exposure to contrast and radiation as a result, as well as the concerns regarding his communication with and treatment of Cath Lab staff. (MEC Minutes, Doc. #137 at 64.) There are significant differentiating circumstances that distinguish Plaintiff's performance on July 13, and Plaintiff has not shown that the white cardiologist engaged in the "same conduct" as Plaintiff such that he is a valid comparator. Haynes, 922 F.3d at 223-24.[19]

Ultimately, Plaintiff has not shown that the white cardiologists are similarly situated comparators who were treated differently than Plaintiff in the same or similar circumstances. See also Irani, 767 F. App'x at 420-21.

---

[19] Indeed, Defendants note that one of Plaintiff's prior incidents in 2001 involved a case that resulted in a patient death, and as a result Plaintiff's privileges were temporarily suspended but were ultimately restored. (Memos, Doc. #135-2 at 38, 39-40, 41-42.)

ii.     Defendants Articulated a Nondiscriminatory Reason for the Adverse Action

Moreover, even if Plaintiff could establish a prima facie case, the Court would then consider whether Defendants had articulated a nondiscriminatory reason for the adverse action.  See Guessous, 828 F.3d at 216.  The burden on Defendants is "one of production, not persuasion, and the Court's analysis 'can involve no credibility assessment.'"  Weaks v. North Carolina Dep't of Transp., 761 F. Supp. 2d 289, 298-99 (M.D.N.C. 2011) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)).  Where a hospital proffers "a legitimate nondiscriminatory basis for the decision to restrict Plaintiff's privileges[,] [t]his basis is entitled to considerable deference in light of the significant public interest in promoting the health and safety of patients and the potentially grave consequences of allowing unqualified physicians to perform medical procedures."  Mbadiwe v. Union Mem. Reg'l Med. Cntr., Inc., No. 3:05CV49, 2007 WL 1219953, at *2 (W.D.N.C. Apr. 4, 2007), aff'd, 265 F. App'x 147 (4th Cir. 2008).

Defendants proffer that Plaintiff's interventional privileges were suspended and then ultimately terminated out of concern for patient safety and quality of care.  (Defs.' Br. at 22.)  Specifically, as described in more detail above, Defendants produced significant evidence demonstrating that Plaintiff's interventional privileges were terminated based on his missed SCAD diagnosis, his decision to intervene, the amount of contrast, radiation, and drugs administered, the failure to consult with another cardiologist, and the concerns expressed by the Cath Lab staff, all in the context of nearly twenty years of care concerns, underscoring the issues specifically cited by Moses Cone in terminating Plaintiff's interventional privileges: poor medical judgment, lack of communication with staff, and the reluctance to seek help from and work with other cardiologists.  Thus, Defendants have articulated a nondiscriminatory reason

39

for terminating Plaintiff's interventional privileges, and the burden shifts back to Plaintiff to establish that this reason is a pretext for race discrimination.

      iii.    <u>Plaintiff Has Not Established that Defendants' Nondiscriminatory Rationales are Pretext for Race Discrimination</u>

Because Moses Cone articulated a legitimate nondiscriminatory reason for terminating Plaintiff's privileges, the burden shifts back to Plaintiff to produce evidence from which a jury could reasonably find that Moses Cone's purported reasons are "pretextual" and that its "true reason is discriminatory." <u>Guessous</u>, 828 F.3d at 216. Plaintiff alleges that Defendants' concerns for patient safety and quality of care are pretextual for three reasons: (1) "inconsistencies in the hospital's explanation"; (2) "disparate treatment"; and (3) "procedural irregularities." (Pl.'s Br. at 20-23.) An employer's proffered explanation is pretextual when "'it is unworthy of credence to the extent that it . . . permit[s] the trier of fact to infer the ultimate fact of intentional discrimination.'" <u>Webb v. Daymark Recovery Servs.</u>, No. 1:21cv424, 2023 WL 3203164, at *15 (M.D.N.C. May 2, 2023) (quoting <u>Dugan v. Albemarle Cnty. Sch. Bd.</u>, 293 F.3d 716, 723 (4th Cir. 2002)). "In order to show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact." <u>Haynes</u>, 922 F.3d at 225.

Plaintiff first contends that Moses Cone's explanation has been "inconsistent" over time because Moses Cone shifted its focus from the July 13 procedure to include Plaintiff's history of care concerns. (Pl.'s Br. at 21.) Although Plaintiff characterizes the discussion of Plaintiff's history of care concerns at the Fair Hearing as Moses Cone "shifting" its explanation, Moses Cone's consistent explanation for suspending and terminating Plaintiff's

40

interventional privileges was, and remains, concerns for patient safety and quality of care. From the beginning of Moses Cone's investigation in July 2019 until the Board voted to permanently terminate Plaintiff's privileges in June 2020, concerns were raised regarding Plaintiff's missed SCAD diagnosis, communication trouble with the Cath Lab, medical judgment in managing complications, and reluctance to seek assistance from other cardiologists. (Subcommittee Minutes, Doc. #137 at 62; MEC Minutes, Doc. #137 at 64; Hearing Report, Doc. #137-1 at 27-41; ARC Memo, Doc. #137-1 at 93-94.) For example, the issues identified by the Investigative Subcommittee in July 2019 included the "missed diagnosis of SCAD," the "lack of communication and conversation with CV lab staff," and issues with "[j]udgment in the management of complications," including the "length of time, including contrast and radiation" involved. (Subcommittee Minutes, Doc. #137 at 62.) Similarly, in May 2020, the ARC explained its decision affirming the Board's decision to terminate Plaintiff's procedures, noting that "Dr. Harwani continues to demonstrate a lack of self-awareness of his communication issues, poor patient selection for interventional cases and poor management of interventional cases, which has resulted in patient harm." (ARC Memo, Doc. #137-1 at 94.) This language mirrors the concerns raised by the Investigative Subcommittee at the inception of the investigation, and there is no evidence or basis for finding that Defendants have changed their position or offered any other reason for the termination of Plaintiff's interventional privileges. Finally, even assuming, as Plaintiff contends and Defendants dispute, that the Fair Hearing Panel and Board relied on evidence of Plaintiff's history of care concerns that were not discussed by the MEC in July 2019, consideration of such evidence merely provided "expand[ed]," but not inconsistent, evidence

41

of Moses Cone's concerns for patient safety. See Haynes, 922 F.3d at 226 ("[A]n employer is certainly permitted to expand on its original reason for termination.").[20]

Turning next to Plaintiff's claims of disparate treatment compared to white interventional cardiologists, the Court explained at length above that Plaintiff's proposed comparators are not valid comparators because none of the white cardiologists that Plaintiff identified were in the same or similar circumstance as Plaintiff. Without evidence of a valid comparator, Plaintiff has not shown that the existence of such comparators supports an inference of pretext. In addition, as noted above, Plaintiff has also failed to present any evidence that doctors of Indian descent were the target of unfair reviews or disciplinary proceedings, and instead the record reflects that many doctors of Indian descent were working as interventional cardiologists at Moses Cone, and doctors of Indian descent were involved in reviewing the June 13 procedure, were involved as members of the MEC, and were involved as part of the Fair Hearing Panel. Thus, there is no evidence of disparate treatment to support an inference of pretext.

Plaintiff also contends that "procedural irregularities," including Defendants' "concealing evidence of 236 SCAD cases" and the "complete disregard for its HR policy requiring investigation of Plaintiff's racial discrimination claim" create a triable issue of fact. (Pl.'s Br. at 22-23.) Plaintiff provides no evidentiary support for his contention that Moses

---

[20] Indeed, Plaintiff was given an opportunity to respond to the concerns and explain his position as part of the Fair Hearing process, and the Fair Hearing Panel considered all of the evidence in making a determination, including Plaintiff's own testimony, which confirmed the concern that he failed to respond to constructive feedback and that his comments "do not reflect the respect for staff or the collaborative approach expected at the Hospital." (Hearing Report, Doc. #137-1 at 37, 41.)

Cone "concealed" evidence of 236 SCAD cases.[21] Moreover, even if Plaintiff had evidence of additional SCAD cases where cardiologists intervened with PCI, the record reflects that each such case involves a case-by-case analysis based on the relevant factors presented, and here all of the Moses Cone and Atrium reviewers concluded that they would not have intervened in the July 13 case in the specific circumstances presented. Ultimately, the Board considered Plaintiff's history of care concerns, his failure to diagnose the patient's SCAD, his decision to intervene in the circumstances presented, his communication failures with staff, and his general unwillingness to seek help from other cardiologists. In light of all of these concerns, Plaintiff has not demonstrated that the hospital significantly deviated from its standard procedures at all, let alone in such a manner that demonstrates evidence of pretext.

With respect to Plaintiff's contention that Moses Cone did not follow internal policy requiring an HR investigation of Plaintiff's racial discrimination claim, Plaintiff has not identified an HR policy that he alleges Moses Cone violated in failing to investigate Plaintiff's claims of discrimination. In addition, the evidence that Plaintiff cites in contending that Moses Cone "disregarded" its HR policy does not clearly indicate whether Moses Cone's Human Resources Department, rather than the MEC, would investigate claims raised by a non-staff physician. (See Harraway-Smith Dep., Doc. #155-6 at 5, 12-13, 18-19, 27-28; Webb Dep., Doc. #155-19 at 60-62.) Defendants contend that the HR department had no authority over medical staff privileges, and instead it was the responsibility of the Medical Staff, the MEC,

_____

[21] The Parties engaged in an extensive discovery dispute regarding Plaintiff's efforts to compel production of 236 patient records at Moses Cone that Defendants identified as containing at least one reference to a certain "CAD" diagnosis code. (Defs.' Resp. to Mot. to Compel, Doc. #130 at 12.) However, the Court concluded that further discovery into these 236 cases was unduly burdensome, and having reviewed the summary judgment briefing there is no reason to think that additional discovery would be warranted, given the lack of any clear relevance, the significant burden, and the expansive discovery already allowed.

and the Board to address Plaintiff's allegations of racial discrimination. (Defs.' Rep., Doc. #157 at 11.) Here, the evidence reflects that the Investigative Subcommittee and the Hearing Panel specifically considered Plaintiff's claims of discrimination, and even sought blind external reviews to avoid the possibility of bias. There is no evidence that Moses Cone deviated from its normal procedures or that a failure to conduct a separate HR investigation for a non-staff doctor is evidence of pretext. As noted above, this is not a case where Plaintiff's claims of bias were ignored or went unanswered. Rather, from the time Plaintiff told the Investigative Subcommittee that he felt the Cath Lab staff were biased against him, Moses Cone took steps to ensure that their process was fair and to address the concerns.[22] Any failure by the HR department to separately investigate Plaintiff's claim does not support an inference of discrimination in this instance.

Based on the foregoing, Plaintiff has not presented evidence that Defendants' nondiscriminatory rationale for terminating Plaintiff's interventional privileges is "unworthy of credence," nor has Plaintiff presented evidence that would provide an inference that Defendants intentionally discriminated against Plaintiff. See Webb, 2023 WL 3203164, at *15. As discussed above, it is not this Court's "province to decide whether the reason [for termination of Plaintiff's privileges] was wise, fair, or even correct, ultimately, so long as it truly was the reason for the [] termination." Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000)).

_____

[22] As previously noted, the evidence reflects that Plaintiff did not allege any bias by Dr. Berry, and instead alleged bias by the Cath Lab staff. However, the Hearing Panel determined that Plaintiff's communication concerns had persisted regardless of who the staff members were, beginning as early as 1998 with staff complaints, and the Hearing Panel concluded that Plaintiff's own testimony further confirmed those concerns, based on how he talked about the staff and their work.

In the end, the record is devoid of any evidence suggesting that Defendants discriminated against Plaintiff based on his race, and Plaintiff has not presented evidence from which a jury could conclude that race was a but-for cause in terminating Plaintiff's interventional privileges. Therefore, Defendants' Motion for Summary Judgment on Plaintiff's claim for race discrimination under § 1981 against Dr. Berry and Moses Cone should be granted, and that claim should be dismissed.

B. Plaintiff's Breach of Contract Claim Against Moses Cone

With respect to Plaintiff's breach of contract claim against Moses Cone, Defendants argue that Plaintiff's claim "hinges on Section 3.2(c) of the Bylaws concerning nondiscrimination," and that because Plaintiff's "discrimination claim [under § 1981] fails . . . his breach claim fails" as well. (Defs.' Br. at 24.) Plaintiff's Response brief does not address the breach of contract claim directly, and instead "focuses on the § 1981 racial discrimination claim because the contract and punitive damages claims derive from it." (Pl.'s Br. at 1.) Thus, Plaintiff contends that if the case "proceeds on [the § 1981] claim, [it] should on the [breach of contract claim], also." (Pl.'s Br. at 1.)[23] As explained in detail above, Plaintiff has not

_____

[23] As noted in this Court's Recommendation on Defendants' Motion to Dismiss, Plaintiff alleged that the suspension and termination of his interventional privileges constituted a breach of contract because Defendants acted "with discriminatory intent." (Am. Compl. ¶ 154.) In Plaintiff's Response Brief to Defendants' Motion to Dismiss as to this claim, Plaintiff cited to Section 3.2(c) of the Bylaws, which provides:

> (c) Nondiscrimination. Staff membership or specific Clinical Privileges shall not be limited or denied on the basis of sex, race, creed, or national origin or on the basis of any other criterion unrelated to the delivery of good patient care at the Hospital, to professional qualifications, to the Hospital's purposes, needs and capabilities, or to the community's needs.

(Pls.' Br. on Mot. to Dismiss, Doc. #37 at 7; Bylaws, Doc. #135-4 at 20.) In the Recommendation on the Motion to Dismiss, the Court noted that Plaintiff did not specify any other provision of the Bylaws at issue, and that "his citation to the nondiscrimination provision of the Bylaws is consistent with his allegations in Claim Two of the complaint asserting breach of contract because Defendants acted with discriminatory intent." (Recommendation, Doc. #44 at 21.)

presented evidence that his interventional privileges were suspended or denied due to racial discrimination. Thus, Plaintiff's claim for breach of contract based on the Bylaws' nondiscrimination provision likewise fails.

Claim Two also cites to North Carolina General Statute § 131E-85, requesting that a new decision on Plaintiff's interventional privileges be reached on a "non-discriminatory basis" as required in the statute. (Am. Compl. ¶ 160.) As described above, Plaintiff has not presented evidence to support his claim that Moses Cone acted in a racially discriminatory manner in suspending and subsequently terminating his interventional privileges, and absent evidence of racial discrimination, Plaintiff has not established a basis for a new decision under § 131E-85.

Therefore, Defendants' Motion for Summary Judgment should likewise be granted as to Count Two, and this claim should also be dismissed.

C. Plaintiff's Claim for Punitive Damages

Because Defendants' Motion for Summary Judgment should be granted as to the substantive claims, Plaintiff's claim for punitive damages against both Defendants should likewise be dismissed.

IV.     CONCLUSION

IT IS THEREFORE RECOMMENDED that Defendants' Motion for Summary Judgment [Doc. #133] should be granted, and the case dismissed with prejudice.

This, the 27th day of March, 2025.

Joi Elizabeth Peake
United States Magistrate Judge

46